LEWIS PUB. CO. v. WYMAN.

(Circuit Court, E. D. Missouri, E. D. April 19, 1907.)

No. 5,417.

1. POST OFFICE—POSTMASTER GENERAL—DECISIONS—REVIEW BY COURTS.

Federal courts have jurisdiction to re-examine the action of the Postmaster General in denying a periodical publisher the right to have his publication mailed as second-class mail matter, when it is asserted that such executive officer acted without authority of law or in excess of the power granted to him by Congress.

2. SAME—ACTS OF ASSISTANTS.

Under Rev. St. § 161 [U. S. Comp. St. 1901, p. 80], authorizing the head of each executive department to prescribe rules and regulatons for the conduct of the officers and clerks therein, and the distribution and performance of the business of the department, pursuant to which the Postmaster General intrusted the determination of matters pertaining to the second-class mailing privilege to the Third Assistant Postmaster General, it was immaterial to the right of a publisher to have an order excluding his publication from the mails as second-class mail matter reviewed by the courts that the hearing was before the Third Assistant Postmaster General, if the order was made by the Postmaster General.

3. SAME—HEARING.

Act March 3, 1901, c. 851, 31 Stat. 1107 [U. S. Comp. St. 1901, p. 2655], provides that, when any publication has been accorded second-class mail privileges, the same shall not be suspended or annulled until a hearing shall have been granted to the parties interested. Complainant, the publisher of a periodical, was notified to appear June 17, 1905, before the

Third Assistant Postmaster General and show cause why the authorization for the admission of his publication as second-class mail matter should not be revoked, and why the third-class rate of postage should not be charged for the transmission of such publication. Complainant appeared and was notified that he might submit evidence, but nothing further was done until April 19, 1906, when the publisher was notified that, as a result of investigation, it was found that his right to mail subscription copies as second-class matter did not exceed 141,328, and that he would be afforded an opportunity to present evidence to the contrary on a subsequent day. The letter also informed him that the right of such publication to second-class entry was also in dispute. On the adjourned day the publisher appeared, but the hearing was limited to the question as to the number of· copies the publisher was entitled to mail as second-class matter, and without further hearing his right to use the second-class privilege at all was subsequently revoked. *Held*, that such order was entered without the hearing required, and was therefore void.

## In Equity.

The complainant, a corporation organized under the laws of the state of South Dakota, charges in its bill that it is engaged in the printing and publishing business, having a publishing plant in University City, Winner Station, one of the substations of the post office of St. Louis, Mo., and that the defendant is the postmaster of said city of St. Louis; that one of the publications owned, printed, and issued by complainant is the Woman's Farm Journal, which has been published for many years as a monthly publication, issued regularly each month; that on December 4, 1891, it was admitted by the post-office department as a publication entitled, under the postal laws of the United States, to the mails at the St. Louis post office as second-class mail matter at the rate of postage of one cent per pound, and ever since has been received and transmitted through the mails at that rate, the periodical having at all times been and is at present so conducted, published, and mailed as to be fully entitled to admission and the use of the mails as second-class mail matter; that the subscription price of said journal has been for 10 years, and now is, 10 cents per annum, and it has always had, and now has, a large and legitimate list of subscribers, and that the benefit of said mailing privilege as second-class matter is of great value to it, and, if the same were taken away from it, the cost of mailing the journal to its subscribers would involve an additional expense of several thousand dollars monthly.

It is further alleged that the journal is not published for circulation at·a nominal price, nor is it designed or used primarily for advertising purposes or for free circulation at nominal rates, but that it is a clean and interesting paper, intended to entertain women on the farms and elsewhere, and is designed for that purpose, and such has been the character of said paper during the period the same has been published and owned by complainant; that shortly prior to October, 1905, a difference arose between the complainant and the defendant as postmaster touching the proper number of copies of said journal which could be mailed monthly as second-class matter under its permit, the defendant claiming that complainant was not entitled to mail so large a number under the said second-class mail privilege as it tendered; that the bona fide and legitimate subscription to the Woman's Farm Journal was at least 315,000 at that time and for a year next preceding, and that under said permit it would be entitled to send through the mails twice the number of said subscriptions, but that since April, 1906, the defendant demanded prepayment at third-class transient rate of one cent for every four ounces on all copies mailed at the St. Louis post office in excess of·141,328 subscriptions, and complainant has been obliged to deposit with defendant security in cash or bonds for said transient rate, under penalty of being denied the use of the mails entirely as to such alleged excess; that in April, 1906, defendant notified the complainant that it was entitled to transmit through the mails at the pound rate not to exceed 282,656 copies of the Farm Journal, and demanded prepayment of postage on all copies in excess, at the transient second-class postage rate,·amounting to one cent for each four ounces, to· be prepaid by stamps,

although complainant protested against this order, claiming a much greater list of bona fide subscribers than 141,328; that, in order to serve and supply the subscribers with the journal, complainant had to deposit large sums of money with the said postmaster, besides indemnity bonds given on the same account, and it therefore complained, and demanded an official investigation of the disputed issue of the actual number of bona fide subscriptions to said journal, which was referred by the defendant to the post-office department at Washington, whereupon complainant was cited to appear for that purpose, and no other, on April 30, and May 1, 1906, before the Third Assistant Postmaster General, where a hearing was accorded to complainant on the issue as to the number of copies which it was entitled to mail at the St. Louis post office at the pound rate; that at said hearing before the Third Assistant Postmaster General that was the only matter taken up and on which evidence was submitted, and upon the completion of the hearing the said Assistant Postmaster General took that subject under advisement, but at no time was the right of complainant to enjoy the continued use of the second-class privilege, nor the question of the suspension or annulment of that privilege, taken up, heard, or in any wise considered at that hearing, but the sole matter heard was as to the number of copies complainant was entitled to mail under its said permit; that after said hearing the said Assistant Postmaster General set on foot an independent and original examination into the circulation of complainant's publication, and at his request all the books, papers, and original documents of complainant were submitted to a commission of five persons employed by the post-office department for that purpose, said examination beginning in June and ending in August, 1906, and that said examination showed a bona fide subscription list of the said Farm Journal of over 310,000, entitling complainant to mail at the St. Louis post office 620,000 copies thereof at the second-class postage rate; that, notwithstanding these facts, defendant intends to deprive complainant entirely of the right to use and enjoy the second-class mail privilege accorded it in 1891 and enjoyed ever since, except as in the bill stated; that such action would cause irreparable damage to complainant, and is in violation of the laws of the United States, which provide that no periodical once admitted to enjoy the second-class mail privilege shall be deprived thereof without a hearing.

The prayer of the bill is that the defendant, as postmaster, be restrained from refusing transmission through the mails as second-class matter of 600,000 copies of the said Farm Journal and depriving complainant of the privilege of the second-class postage rates as granted to it for said journal in 1891; that the court ascertain and adjudge the amount of legitimate subscriptions of the said Woman's Farm Journal as of March 1, 1907, and for prior months since September, 1905, to the end that it may be determined what number of copies complainant is entitled to send through the mails as second class matter.

Upon presentation of the bill and a preliminary answer filed by defendant, a rule on the defendant to show cause why a temporary injunction should not be granted was issued, and in the meantime a temporary restraining order was granted to maintain the status quo, restraining the postmaster from refusing the admission of the magazine at second-class rates, but in no wise interfering with the order made limiting the number of copies admitted at that rate.

The answer first filed by the defendant was withdrawn, and in lieu thereof he filed a response to the order to show cause, in which he denies the jurisdiction of the court to grant any of the relief demanded, and then sets up the following grounds why, if the court does assume jurisdiction, an injunction should be denied: It denies that the privilege to mail the Woman's Farm Journal as second-class mail matter had been annulled without a hearing, but, on the contrary, the defendant charges that the said journal was excluded from that privilege upon three grounds: First, that it did not have a legitimate list of subscribers; second, that it was designed primarily for advertising purposes; and, third, that it was circulated at nominal rates of subscription—that before this privilege was withdrawn the complainant was accorded two hearings before the Third Assistant Postmaster General, the first on June 17, 1905, and the second on April 30, and May 1, 1906, at each of which it was represented by its president and counsel; that the publication con-

sists principally of advertising, the advertisements being editorial and space; that much of the advertising space, as well as the editorial page, is used as a medium for promoting various business enterprises and interests controlled in whole or in part by the president of the publishing company, and that the reading matter consists partly of short and serial stories, but largely of brief notes and clippings, such as are ordinarily contained in advertising circulars transmitted through the mails at the third-class postage rate; that the statute provides, as among the conditions upon which publications may be admitted to the second-class privilege, that "it must be originated and published for the dissemination of information of a public character or devoted to literature, the sciences, arts or some special industry, and having a legitimate list of subscribers; provided, however, that nothing herein contained shall be so construed as to admit to the second-class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates"; that the president of the publishing company has promoted or exploited through the medium of the journal more than a dozen of his private enterprises, one of which was the People's United States Bank, against which a fraud order was issued by the Postmaster General on July 6, 1905, for the reason that the sales of its stock had been made and deposits induced upon false representations and promises, and that the funds of the institution were being misapplied; that the complainant advertises a much larger circulation for said journal than it possesses for the purpose of charging a higher rate for its advertising; that an exhaustive inquiry into the publication methods of complainant was instituted by the department in March, 1905, which extended to April, 1906, this was followed in May, 1906, under like direction, by an inquiry conducted by different officers attached to another bureau of the post-office department, which extended to February, 1907; that it was found that a great many copies were sent out in excess of the bona fide subscription and the number of sample copies allowed by the rules and regulations of the department; that such official inquiry disclosed the further fact that a very large proportion of the subscriptions had been obtained at the club rate of five and six cents per annum, instead of at the advertised rate of ten cents; that many subscriptions are furnished free, and others at greatly reduced rates and in pursuance of advertising arrangements; that the average amount received in cash upon the copies of the publication mailed was approximately three and one-third cents per annum; that in April, 1906, after having learned by very thorough tests and exhaustive inquiry that almost one-half of the mailings of the journal were illegitimate, the postmaster at St. Louis, acting under the instructions from the post-office department, began collecting from the Lewis Publishing Company a transient second-class postage rate of one cent a copy, which additional postage has amounted to about $7,000 a month on this journal and the Woman's Magazine, also published by complainant; that complainant appealed from the action so taken by the postmaster, and was accorded a hearing on April 30, and May 1, 1906, upon the question whether the postmaster should be sustained in his action in collecting excess postage, and also upon the question of the legitimacy of the subscription lists of the publications. Following that hearing the second official inquiry was instituted, and as a result of that inquiry the original finding as to the number of subscribers to the publication was substantially confirmed. This inquiry developed that in order to maintain the circulation of the Farm Journal at 600,000, as advertised, and of the Woman's Magazine at the advertised circulation of a million and a half, the company was sending 74 per cent. of its mailings of the Farm Journal to persons whose subscriptions had expired; that the postal laws and regulations treat as subscribers "those who voluntarily seek and pay for the publication with their own money"; that on March 4, 1907, the Postmaster General, by an order duly promulgated, directed the said Farm Journal to be excluded from the second-class mailing privilege, upon the ground, first, that it had not a legitimate list of subscribers; second, that it was designed primarily for advertising purposes; and, third, that it was circulated at nominal rates of subscription, and at the same time also dismissed complainant's appeal from the action of the postmaster at St. Louis requiring the higher rate of postage on all copies of the journal sent through the mails in excess of that allowed by the

rules and regulations of the department, and approving the finding of the postmaster that the bona fide subscription list did not exceed 141,323 and directing the postmaster to collect the postage on the excess copies mailed.

The issues being thus made up, a hearing was had, the complainant producing his witnesses in court for oral examination, subject to cross-examination, and having also taken depositions of witnesses upon notice. The defendant introduced some witnesses and also offered an affidavit of the chief clerk of one of the divisions of the post-office department at Washington.

Barclay & Fauntleroy and Carter, Collins & Jones, for complainant.
Chester H. Krum and H. H. Glassie, for defendant.

TRIEBER, District Judge. The contention of counsel for defendant that the courts have no jurisdiction to re-examine the action of the head of one of the executive departments in matters of this kind cannot be sustained, as it is well settled that courts have jurisdiction to re-examine the action of the head of one of the executive departments in matters of this kind when he is either acting without authority of law or in excess of the power granted to him by law, has proceeded in violation of an act of Congress, or has misconstrued the legal effect of the statute under which he is acting. Teal v. Felton, 12 How. 284, 13 L. Ed. 990; School of Magnetic Healing v. McAnnulty, 187 U. S. 94, 23 Sup. Ct. 33, 47 L. Ed. 90; Houghton v. Payne, 194 U. S. 88, 24 Sup. Ct. 590, 48 L. Ed. 888; Bates & Guild Co. v. Payne, 194 U. S. 106, 24 Sup. Ct. 595, 48 L. Ed. 894; Harris v. Rosenberger, 145 Fed. 449, 76 C. C. A. 225; People's U. S. Bank v. Gilson (C. C.) 140 Fed. 1. The bill charges that the acts of the Postmaster are in violation of law.

The fact that the hearing was before the third Assistant Postmaster General and the order made by the Postmaster General is immaterial. The statute only authorizes the Postmaster General to grant or revoke these privileges; but, as Congress well knew that it would be impossible for the head of any executive department to give a hearing in person to all matters coming before that department, it has authorized the head of each department to prescribe rules and regulations for the conduct of the officers and clerks and the distribution and performance of its business. Section 161, Rev. St. [U. S. Comp. St. 1901, p. 80]. In pursuance of this authority, the Postmaster General has intrusted the determination of matters pertaining to the second-class mailing privilege to the Third Assistant Postmaster General, subject, of course, to his approval. The actions of the Assistant Postmaster General on matters of this kind are merely those of a master or referee of a court to hear proofs and report his findings of fact and probably conclusions of law. It is the judge of the court, or, in cases of this kind, the head of the department, who finally acts on that matter, either adopting the recommendations of the referee or assistant, or rejecting them. It is the head of the department who promulgates the conclusions as his own, independent of what the recommendations of his assistant might have been. The courts will conclusively presume that the head of the department acted on the testimony submitted to him as fully as if he had been present at the hearing and had not submitted it to one of his assistants.

The next question to be determined is: Was there a hearing granted to the defendant within the meaning of the Act of March 3, 1901, c. 851, 31 Stat. 1107 [U. S. Comp. St. 1901, p. 2655]? This statute provides:

"When any publication has been accorded second class mail privileges, the same shall not be suspended or annulled until a hearing shall have been granted to the parties interested."

Sections 10 and 14 of Act March 3, 1879, c. 180, 20 Stat. 359 [U. S. Comp. St. 1901, pp. 2646, 2647], are as follows:

"Sec. 10. That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals and as frequently as four times a year and are within the conditions named in sections 12 and 14."

"Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

"First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue and be numbered consecutively.

"Second. It must be issued from a known office of publication.

"Third. It must be formed of printed paper sheets without board, cloth, leather or other substantial binding such as distinguishes printed books for preservation from periodical publications.

"Fourth. It must be originated and published for the dissemination of information of a public character or devoted to literature, the sciences, arts or some special industry, and having a legitimate list of subscribers; provided, however, that nothing herein contained shall be so construed as to admit to the second class rate regular publications designed primarily for advertising purposes or for free circulation or for circulation at nominal rates."

In order to determine what Congress meant by providing for "a hearing" by the act of March 3, 1901, it is advisable to ascertain the state of law at the time of the passage of the act and thus find the mischief then existing and sought to be remedied. It had been conclusively determined by the decisions of the various national courts, including the Supreme Court of the United States, that the power of Congress over the postal system was plenary, absolute, and exclusive; that it embraced the regulation of the entire postal system of the country, including the right to designate what shall be carried and what excluded, and at what rates. Ex parte Jackson, 96 U. S. 727, 24 L. Ed. 877; In re Rapier, 143 U. S. 110, 12 Sup. Ct. 374, 36 L. Ed. 93; Enterprise Savings Association v. Zumstein, 67 Fed. 1000, 15 C. C. A. 153; Dauphin v. Key, McArthur & M. (D. C.) 203; Missouri Drug Co. v. Wyman (C. C.) 129 Fed. 623.

It had also been decided many times that the duty of determining facts could by Congress be intrusted to the head of the department charged with the administration to which that matter belongs, and the findings of facts made by the head of a department, uninfluenced by fraud or mistake of law, are regarded as conclusive, and will not be disturbed by the courts. Johnson v. Towsley, 13 Wall. 72, 20 L. Ed. 485; Lee v. Johnson, 116 U. S. 48, 6 Sup. Ct. 249, 29 L. Ed. 570; Lake Superior Co. v. Cunningham, 155 U. S. 354, 15 Sup. Ct. 103, 39 L. Ed. 183; Burfenning v. Chicago & St. Paul Ry., 163 U. S. 321, 16 Sup. Ct. 1018, 41 L. Ed. 175; Gonzales v. French, 164 U. S. 338, 17 Sup. Ct. 102, 41 L. Ed. 458; Johnson v. Drew, 171 U. S. 93, 18 Sup. Ct. 800, 43 L. Ed. 88. The power thus vested in the Postmaster

General was great, and not being reviewable by the courts, except for fraud or mistake, that official had the power to practically destroy any magazine or newspaper by merely withdrawing the second-class privilege from such magazine or periodical; for no such publication having an extended circulation outside of the place where it is published could exist for any length of time if required not only to pay the third-class postage, but to prepare it for the mails as such matter.   It was to remedy this mischief, no doubt, that this provision was added to the appropriation act of March 3, 1901, making the appropriation for the service of the post-office department for the fiscal year ending June 30, 1902.   If this was the intent of Congress, and it is impossible to conceive of any other, then something more was meant by "a hearing" than mere notice to the publisher to show cause by a day certain why the privilege theretofore accorded to him should not be revoked. It may be conceded that Congress did not intend to confer upon the head of an executive department judicial powers, nor that there should be a hearing according to the strict rules governing courts, and it may also be conceded that this is a mere privilege and not a right which has become vested by the original permit; still, in order to make it a hearing, as I construe the meaning of this act, the publisher should not only be cited to show cause, but, after appearing in response to the citation, ready to show cause, be given the opportunity of presenting his evidence and also be informed what he is called upon to answer. If by reason of the umpire, commissioner, or acting head of the department, who is to hear and pass upon the matter in the first instance, he is prevented from presenting his evidence or induced not to do so upon the assurance of being given an opportunity to do so at a later day, then the action of the head of the department, without giving him the opportunity to be heard and offer proofs in support of his claims, is not a hearing within the meaning of the statute, and the acts of the Postmaster General without such hearing are absolutely void for want of jurisdiction.

The undisputed facts as they appear in this case on this subject are: That the Women's Farm Journal was admitted at the post office at St. Louis as a publication entitled to the use of the mails as second-class matter, at the rate of postage of one cent per pound, on December 4, 1891.   That about May 17, 1905, some post-office inspectors recommended to the department that the second-class privilege of that journal be revoked.   That acting upon that recommendation the Third Assistant Postmaster General on June 5, 1905, sent the following citation to the publishers of the Woman's Farm Journal (the words in italics were printed and the others typewritten).

Edwin C. Madden, Third Asst. P. M. General.                    Form 3,557.

Post Office Department.

Office of the Third Assistant Postmaster General, Classification Division.

58,208.                                        Washington, D. C., June 5, 1905.

*Publisher* of Woman's Farm Journal, Saint Louis, Missouri—*Sir: You are hereby notified that, in accordance with the Act of Congress approved March 3, 1901 (ch. 851, 31 Stats. at L., 1107), you will be granted a hearing at the office of the Third Assistant Postmaster General, Washington, D. C., at 2:30 p. m. on* Saturday, June 17, 1905, *to show cause why the authorization for the*

*admission of* "Woman's Farm Journal," *to the second class of mail matter under the act of March 3, 1879, should not be revoked, and why the third-class rate of postage should not be charged for the transmission of that publication in the mails, upon the following ground:* That this publication comes within the following prohibition of the statute:

"Provided, however, that nothing herein contained shall be so construed as to admit to the second-class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates"—

in that, first, it is primarily designed for advertising purposes; second, it is primarily designed to advertise the other businesses in which stockholders and officers of the publishing company, and especially E. G. Lewis, are interested; third, it is primarily designed for free circulation or for circulation at nominal rates.

*Your answer, in writing, must be submitted on or before* Saturday, June 17, 1905.

*Should you desire to avoid the expense and trouble incident to a trip to Washington, your written answer will be given the same full and painstaking consideration as though you appeared in person or by representative.*

*Respectfully,*                                         Edwin C. Madden,
GGT–HMB–r                                   *Third Assistant Postmaster General.*
Registered.

That, in response to this citation, the complainant by its officers and attorneys appeared before the Third Assistant Postmaster General on June 17, 1905, and presented an elaborate oral statement with respect to the matters mentioned in the citation; Mr. Lewis, the president of complainant, being interrogated by the Third Assistant Postmaster General and his attorney in respect to the same matter, and at its conclusion complainant was notified that he might submit any other evidence he might desire. Nothing further was done in the matter until April 19, 1906, when the Third Assistant Postmaster General sent the following letter to Mr. Lewis as president of complainant:

Post Office Department.
Office of Third Assistant Postmaster General, Division of Classification.
April 19, 1905.

Mr. E. G. Lewis, President, Lewis Publishing Company, St. Louis, Missouri —Dear Sir: The ruling of the postmaster at St. Louis, dated April 6th, concerning the excess mailings of the Woman's Farm Journal and the ruling of April 12th, concerning excess mailings of the Woman's Magazine, have been reported to this office with notice that you had appealed from the ruling in the case of the Woman's Farm Journal. Your letter to the Hon. Jesse Overstreet with accompanying statement in which that appeal appears to be embodied has also been received by this office. Although these latter papers can not in strictness be said to constitute an appeal to this office from the ruling of the postmaster, nevertheless they will be treated as such. As a result of his investigation the postmaster has found and determined that the legitimate subscriptions to the Woman's Farm Journal number not to exceed 141,-328, entitling the publisher to mail samples not to exceed an equal number and that the subscriptions to the Woman's Magazine number not to exceed 539,901, entitling the publisher to mail samples not to exceed that number. With regard to that appeal from the ruling of the postmaster as to excess mailings, I have to inform you that the facts found by the postmaster will, in the absence of evidence to the contrary, be taken as prima facie correct. You will be accorded an opportunity at this office April 27th next at 2:30 p. m., to present any and all evidence to the contrary which it may be your wish to lay before me for consideration in connection with your appeal. In this connection you are also informed that the question of the right of these publications to second-class entry is in dispute.

*Respectfully,*                                         Edwin C. Madden,
                                            Third Assistant Postmaster General.

This entire letter was typewritten.

At the request of complainant this hearing was postponed until April 30, 1906.

It will be noticed that this last letter or citation deals almost wholly with the ruling of the postmaster at St. Louis concerning excess mailings of complainant's publications made April 6, 1906; only the concluding part referring to the right of the second class privilege. Complainant, when notified by the postmaster at St. Louis of his action in regard to the number of copies he was authorized to send through the mails at the one cent per pound rate, appealed from that decision to the Third Assistant Postmaster General, in conformity with the rules prescribed by the department, and which will be found in Postal Guide of 1906, p. 1000, amending section 485 of the postal laws and regulations. In this appeal it asked for a refund of the excess postage paid by it under protest to the postmaster at St. Louis in order to secure admission of its publications to the mails, and which amounted to $3,100 for the May issue of this Journal. That is the appeal referred to in the letter of the Third Assistant Postmaster General. On April 30th the president and some of the other officers of the complainant, with their attorney, Judge Barclay, appeared at the office of the Third Assistant Postmaster General in the city of Washington, and the following proceedings were had:

"Gen. Madden (Third Assistant Postmaster General): I wish to say, Mr. Lewis, that ordinarily hearings of this kind are open; that we admit the press or any person interested in what may be going on before the office, and you are privileged to have any persons you desire or to have excluded every person except those belonging to the department, all who are here, at least, by invitation. It is entirely with yourself to determine that question. If you have any objection to the presence of any person, we will exclude them.

"Mr. Lewis: Thank you, General; we have no objection at all."

After a few remarks made by Hon. Richard Bartholdt, member of Congress from the district in which complainant's plant is situated, Judge Barclay, as attorney for complainant, addressed Gen. Madden as follows:

"General, in order to put the precise question before you in a formal way, perhaps it would be well to read our appeal from the decision of the postmaster at St. Louis.

"Gen. Madden: I think you had better read that.

"Judge Barclay: It is quite short."

He thereupon read the appeal, and proceeded to address the Third Assistant Postmaster General as follows:

"There is one thing, Gen. Madden, in your letter that I wish to ask you about particularly, and that is as to the paragraph of your honored communication of the 19th of April in regard to the question of circulation. It is the last paragraph in your communication of the 19th where you say, 'In this connection you are also informed that the question of the right of these publications to second class entry is in dispute.' If that matter is to be heard independently of the question of circulation, we would like to understand that, because it is involved with and bears upon the issue as to the circulation.

"Gen. Madden: It is independent of this.

"Judge Barclay: Then we will be heard upon that question?

"Gen. Madden: Not necessarily to-day. This is on the appeal.

"Judge Barclay: Then we will only talk on the appeal to-day. Is that right?

"Gen. Madden: That is right."

Gov. Lon V. Stevens thereupon introduced Mr. Lewis to Gen. Madden, stating that they had implicit confidence in Mr. Lewis, to which the following reply was made:

"Gen. Madden: I am glad to know that. Now, Mr. Lewis, the report of the postmaster at St. Louis is that there is an excess of mail amounting approximately to 300,000 copies of the Woman's Farm Journal, and I deem the statement as prima facie correct as to that. You can show to the contrary, an opportunity to do which is now given you.

"Mr. Lewis: I will say as to the Woman's Magazine—

"Gen. Madden: Let's consider one case at a time. We had better proceed with one publication at a time.

"Judge Barclay: Are we at liberty to know on what information the department has acted?

"Gen. Madden: It has acted on information furnished here through the investigations that have been made from time to time and reports put in.

"Judge Barclay: Are we to have the privilege of seeing those reports and knowing what the facts are, if they amount to the improper use of the mail?

"Gen. Madden: The entire question is one of fact, and it will be immaterial what the postmaster has reported, or even what Mr. Lewis shall state. If it becomes necessary to determine the facts, we will have other means of determining them.

"Mr. Glassie, Counsel for the Post-Office Department: You have the precise figures, have you not?

"Mr. Lewis: Yes, sir.

"Judge Barclay: What is Mr. Wyman's claim as to our circulation?

"Mr. Glassie: The claim is that the legitimate subscriptions to the Woman's Farm Journal are not to exceed 141,328, and to the Woman's Magazine not to exceed 539,901.

"Gen. Madden: Now, Mr. Lewis, I will ask you some questions. Do you wish to make some statements now?

"Mr. Lewis: We wish to state, regardless of the source of the information upon which these figures are based, that they are absolutely incorrect. Is Mr. Glassie going to ask some questions?

"Mr. Glassie: No. I wanted to give you the figures that are claimed to be in excess or outside of the second class privilege. Let's find the exact number of copies claimed to be in excess, so you will know that.

"Mr. Lewis: Yes; we understand that.

"Mr. Glassie: That is the issue.

"Mr. Lewis: My understanding is that the hearing to-day is to be separate from the last clause of the department letter; that is, that it isn't on the general character of the publications or their being entitled to second class privilege.

"Gen. Madden: No, sir.

"Mr. Lewis: It is purely on excess of second class mailings.

"Gen. Madden: Yes.

"Mr. Lon V. Stevens, Vice President of Complainant: I want to be well understood here. Are we going to have the privilege of knowing what the facts are tending to establish the prima facie case made by Mr. Wyman or anybody else?

"Gen. Madden: No, sir. I am going to give you the opportunity of hearing what you have to say and your own figures, independently of the prima facie case."

On May 3, 1906, two days after the hearing, the Third Assistant Postmaster General appointed a commission of five employés of the post-office department, with directions to said commission to proceed to St. Louis, Mo., and there, in co-operation with the Lewis Publishing Company, to make an investigation and to report upon the circulation of the said Woman's Farm Journal. An investigation was made by this commission, assisted by a committee appointed by complainant,

who went through all the books and papers of the complainant throwing any light on the question of subscription, and finally reporting that the subscription list of the Farm Journal, as shown by the books and papers of the complainant, was in excess of 300,000. Nothing further seems to have been done in the matter until March 4, 1907, when the Postmaster General issued an order to the postmaster at St. Louis, Mo., advising him that the appeal of the publishers of the Woman's Farm Journal had been dismissed, and, furthermore, that the second-class mailing privilege theretofore extended to the journal is withdrawn. This letter is as follows:

"Office of the Postmaster General,

"Washington, D. C., March 4, 1907.

"Sir: In the case of the appeal of the publisher of the Woman's Farm Journal from your recommendation and action in the matter of demanding and collecting postage at the transient second-class rate on all copies of said publication mailed monthly in excess of its legitimate subscribers, which, as shown by the extended investigations of the Department and the count of October 13, 1905, aggregated 141,328, and in excess of a like number properly marked and sent as sample copies, you are informed that upon a hearing granted the publisher on April 30 and May 1, 1906, and a careful and thorough investigation by the Department, your recommendations are approved and your action sustained. You will, therefore, remit to the Department in cancelled stamps attached to sheets of paper, the excess postage that has been collected by you, and also make demand on the publisher for the balance due the Government, under the law and the regulations of the Department, at the transient second-class rate of postage, upon all excess copies of the publication mailed on and after October 1, 1905. In the matter of your recommendation that the Department revoke the order granting second-class mailing privilege to this publication, you are informed that upon a hearing granted the publisher on the same dates (April 30 and May 1, 1906), and upon a careful and thorough investigation of all of the evidence by the Department, I find that the publication does not have a legitimate list of subscribers, that it is designed and published primarily for advertising purposes; and that it is being circulated at a nominal rate, contrary to the law and the regulations of the Department. You will, therefore, refuse hereafter to accept for mailing at the second-class rate of postage copies of the said publication, and inform the publisher that the second-class mailing privilege heretofore extended the Woman's Farm Journal is withdrawn, and that the order granting the same is revoked.

"Very respectfully,         Geo. B. Cortelyou, Postmaster General.

"The Postmaster, St. Louis, Missouri."

The letter of April 19, 1906, of the Assistant Postmaster General to the complainant, as well as the proceedings had before that official on April 30, and May 1, 1906, show conclusively that the hearing in June, 1905, was not treated as final, and that the post-office department at the hearing on April 30, 1906, led complainant to believe that it would be given a full opportunity to be heard and submit evidence on the issue of revoking the second-class privilege under the citation of June 5, 1905, and, relying upon that assurance, complainant did not at that hearing present any evidence. The order of the Postmaster General revoking the privilege also shows that it is based solely upon the hearing had on April 30, and May 1, 1906.

It is therefore impossible to sustain the contention that the order revoking the second-class privilege of complainant was based upon the hearing had in June, 1905, and as it is undisputed that at the hear-

ing had on April 30, and May 1, 1906, complainant was advised that this matter would not be taken up then, but that he would be notified thereafter when to appear for a hearing on that issue, and it never has been so notified, it is impossible for the court to make a finding that there had been any hearing on this issue, within the meaning of the law.

This conclusion makes it unnecessary to determine whether it is essential in order to constitute a hearing under the act of March 3, 1901, that the publisher be either confronted with the witnesses whose testimony is to be used against him or that he be at least furnished their testimony and names in order that he may be able to rebut their evidence, if it is possible for him to do so.

The other issue involved is whether the determination by the Postmaster General of the number of bona fide subscribers which the journal has, and consequently the number of copies which it may send through the mails under the second-class rate privilege, can be reviewed by the courts. Congress has not seen proper to provide for a hearing in matters of that nature. It has left the law as it had always been construed. The wisdom of this policy is not to be determined by the courts. Congress alone has control of that.

In Veazie Bank v. Fenno, 8 Wall. 533, 548, 19 L. Ed. 482, it was contended that:

"The tax [in the case before the court] was so excessive as to indicate a purpose on the part of congress to destroy the franchise of the bank, and was therefore beyond the constitutional power of Congress."

But Chief Justice Chase, who delivered the opinion of the court, in reply to that contention, said:

"The first answer to this is that the judicial cannot prescribe to the legislative department of the government limitations upon the exercise of its acknowledged powers,. The power to tax may be exercised oppressively upon persons, but the responsibility of the Legislature is not to the courts, but to the people by whom its members are elected."

Of the many cases to the same effect the following may be cited: McCulloch v. Maryland, 4 Wheat. 316, 428, 4 L. Ed. 579; Kirtland v. Hotchkiss, 100 U. S. 491, 497, 25 L. Ed. 558; Spencer v. Merchant, 125 U. S. 345, 355, 8 Sup. Ct. 921, 31 L. Ed. 763; The Chinese Exclusion Cases, 130 U. S. 581, 609, 9 Sup. Ct. 623, 32 L. Ed. 1068.

In the case at bar it seems that there was a hearing granted to complainant and a commission appointed by the department, who examined the books and papers of the publishing company bearing upon the subject of its bona fide subscribers. It seems that from this examination it appeared that the journal had over 300,000 subscribers. Still the Postmaster General, from evidence submitted to him, as stated in his order, found that the bona fide subscription list of the journal did not exceed 141,328 copies, as found by the Postmaster of St. Louis. There is nothing to show in this case how he arrived at that conclusion, and what additional evidence was before him, except in the response to the rule to show cause why the temporary injunction should not be granted defendant alleges:

"The postmaster made inquiry of the postmasters at the post offices of address of 1,000 of these excess copies of the issue of the Woman's Farm Journal

for October, 1905, and the replies received showed that 90 per cent. of the persons to whom such copies had been mailed had never subscribed for the publication. Five hundred names taken from similar copies were submitted to the publisher, with the request that he exhibit accurate records showing that they represented persons whose subscriptions had expired, but he was able to supply only 6 such names of the 500 claimed. Later he repeated his claim that these excess copies were mailed to persons whose subscriptions had expired, but, on being confronted with the results of the inquiries made by the postmaster and the investigating officers, admitted that such copies had been mailed, not to persons whose subscriptions had expired, but to persons whose names had been selected by him. He then claimed that payment for these copies was made from a special fund contributed by his sympathizers. but failed to substantiate this statement. These excessive mailings were, in fact, sample copies illegally mailed."

No evidence to sustain these allegations was offered on behalf of the defendant. It is therefore impossible for the court to determine how the conclusions were reached by the Postmaster General, and whether these conclusions are correct and supported by proper proofs; but, as Congress has seen proper to intrust this entire matter to the Postmaster General, the courts are powerless to interfere.

As shown by the citations in the first part of this opinion, it has always been held that the power possessed by Congress embraces the regulation of the entire postal system of the country, including the right to designate what shall be carried and at what rates, and that this power may be lawfully delegated to the Postmaster General. Section 3962 of the Revised Statutes [U. S. Comp. St. 1901, p. 2704] authorized the Postmaster General to make deductions from the pay of contractors for the failure to perform services according to contract and impose fines upon them for other delinquencies, and it has been uniformly held that the action of the Postmaster General, under the power granted him by this section, is a matter within his discretion, and not subject to review by the courts. Chicago, etc., Ry. Co. v. United States, 127 U. S. 406, 407, 8 Sup. Ct. 1194, 32 L. Ed. 180; Eastern Ry. Co. v. United States, 129 U. S. 391, 396, 9 Sup. Ct. 320, 32 L. Ed. 730; Allman v. United States, 131 U. S. 31, 35, 9 Sup. Ct. 632, 33 L. Ed. 51.

It is impossible to give any convincing reason why Congress cannot delegate powers of this nature to the Postmaster General without judicial intervention, in the same manner as the regulation and enforcement of the immigration laws have been entrusted to the heads of other departments. That this may be done in the latter cases is now no longer open to discussion. Nishimura Ekiu v. United States, 142 U. S. 651, 12 Sup. Ct. 336, 35 L. Ed. 1146; The Japanese Immigrant Cases, 189 U. S. 86, 97, 23 Sup. Ct. 611, 47 L. Ed. 721; United States v. Ju Toy, 198 U. S. 253, 261, 25 Sup. Ct. 644, 49 L. Ed. 1040. In the last cited case the court say:

"The broad question is presented whether or not the decision of the Secretary of Commerce and Labor is conclusive."

And, after reviewing a large number of authorities, the court answers the question as follows:

"In view of the cases which we have cited, it seems no longer open to discuss the question propounded as a new one."

In the Japanese Immigrant Cases the court said:

"The constitutionality of the legislation in question in its general aspects is no longer open to discussion in this court. That Congress may exclude aliens of a particular race from the United States, prescribe the terms and conditions upon which certain classes of aliens may come to this country, establish regulations for sending out of the country such aliens as come here in violation of law, and commit the enforcement of such provisions, conditions, and regulations exclusively to executive officers without judicial intervention, are principles firmly established by the decisions of this court."

In Passavant & Co. v. United States, 148 U. S. 214, 219, 13 Sup. Ct. 572, 37 L. Ed. 426, the question presented was whether the courts could review the decision of the Board of General Appraisers under the act of June 10, 1890, as to the dutiable value of imported merchandise; and the court held:

"It was certainly competent for Congress to create this Board of General Appraisers, called 'legislative referees' in an early case in this court (Rankin v. Hoyt, 4 How. 327, 339, 11 L. Ed. 996), and not only invest them with authority to examine and decide upon the valuation of imported goods, when that question was properly submitted to them, but to declare that their decision 'shall be final and conclusive as to the dutiable value of such merchandise against all parties interested therein.' * * * In the tariff legislation of the government, Congress has generally adopted means and methods for a speedy and equitable adjustment of the question as to the market value of imported articles, without allowing an appeal to the courts to review the decision reached. If dissatisfied importers, after exhausting the remedies provided by the statute to ascertain and determine the fair dutiable value of imported merchandise, could apply to the courts to have a review of that subject, the prompt and regular collection of the government's revenues would be seriously obstructed and interfered with."

No doubt Congress has thought that to permit the courts to review the findings of facts made by the Postmaster General in cases of this nature might have that same effect upon the mails as is said by the Supreme Court the effect would be on the collection of the government revenue, although since then Congress has seen proper to confer the power upon the courts to review the actions of the Board of General Appraisers. If the Postmaster General had authority to pass on this matter, then, in the language of Mr. Justice Holmes, in United States ex rel. v. Hitchcock, 205 U. S. ——, 27 Sup. Ct. 423, 51 L. Ed. ——: "His jurisdiction did not depend upon his decision being right." In Chicago, Burlington & Quincy Ry. v. Babcock, 205 U. S. ——, 27 Sup. Ct. 326, 51 L. Ed. ——, the court, in passing upon the acts of a State assessing board which were attacked by the railway company, said:

"The board was created for the purpose of using its judgment and its knowledge. State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663, and other cases. Within its jurisdiction, except as we have said, in case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The state has confided those rights to its protection and has trusted to its honor and capacity, as it confides the protection of other social relations to the courts of law. Somewhere there must be an end."

Evidence was introduced by complainant establishing the fact that the proportion of advertising matter in the journal, in comparison with the literary, editorial, and other reading matter, is no greater, and in some instances smaller, than that of some of the leading maga-

zines and newspapers of the country who are permitted to enjoy the second-class rate privilege. It is not contended that this evidence is sufficient to establish fraud on the part of the Postmaster General; in fact, the application of any such supposed rule of uniformity would render the law impossible of enforcement, for it would then be impossible for the post-office department to exclude any publication until it has acted on all publications, but, as hereinbefore shown, the courts are unable to consider this testimony except for the purpose of establishing fraud.

In De Cambra v. Rogers, 189 U. S. 119, 122, 23 Sup. Ct. 519, 47 L. Ed. 734, the court said:

"It is hardly necessary to say that, when a decision has been made by the Secretary of the Interior, courts will not entertain an inquiry as to the extent of his investigation and knowledge of the points decided, or as to the method by which he reached his determination."

Applying the foregoing rules to the facts in this case, the court finds itself powerless to interfere or review the action of the postmaster at St. Louis, affirmed by the Postmaster General, as to the number of copies of the journal which complainant can transmit through the mails at the one cent per pound rate.

There will be a temporary injunction restraining the defendant from enforcing that part of the order of the Postmaster General withdrawing the second-class mailing privilege granted to complainant for the Woman's Farm Journal; but as to all other matters the injunction will be denied.