## KEYSER v. HITZ.

ERROR TO THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

No. 42. Argued October 25, 28, 1889.—Decided January 6, 1890.

After the passage of the act of June 30, 1876, 19 Stat. 63, savings banks organized in the District of Columbia under an act of Congress, and having a capital stock paid up in whole or in part, were entitled to become national banking associations in the mode prescribed by Rev. Stat. § 5154.

A certificate signed by the Deputy Comptroller of the Currency as "Acting Comptroller of the Currency," is a sufficient certificate by the Comptroller of the Currency within the requirements of Rev. Stat. § 5154.

The record from the trial court must be taken in this court as it was presented to the appellate court below, and an objection to it, not made there, will not be considered here.

A transfer of stock in a bank to a person without his or her knowledge or consent, does not of itself impose upon the transferee the liability attached by law to the position of a shareholder in the association; but if, after the transfer, the transferee approves or acquiesces in it, or in any way ratifies it, (as, for instance, by joining in an application to convert the bank into a national bank,) or accepts any benefit arising from the ownership of such stock, he or she becomes liable to be treated as a shareholder, with such responsibility as the law imposes in such case; and this liability.is the same whether new certificates have or have not been issued to the transferee after the transfer.

The endorsement, by the payee, of a check which appears on its face to be drawn by the cashier of a bank in payment of a dividend due the payee as a stockholder, estops him from denying knowledge of its contents or ownership of the shares.

A married woman in the District of Columbia may become a holder of stock in a national banking association, and assume all the liabilities of such a shareholder, although the consideration may have proceeded wholly from the husband.

The coverture of a married woman, who is a shareholder in a national bank, does not prevent the receiver of the bank from recovering judgment against her for the amount of an assessment levied upon the shareholders equally and ratably under the statute; but no opinion is expressed as to what property may be reached in the enforcement of such judgment.

THE case is stated in the opinion.

*Mr. Leigh Robinson* for plaintiff in error.

*Mr. Enoch Totten* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action is based upon an assessment made by the Comptroller of the Currency on the stockholders of the German-American National Bank of the city of Washington, which suspended business on the 30th day of October, 1878, and of which the plaintiff in error was appointed receiver. The assessment was upon the stockholders, equally and ratably, to the amount of one hundred per centum of the par value of their shares. It was averred in the declaration filed by the receiver that the defendant, Jane C. Hitz, held or owned at the time of the bank's suspension two hundred shares of its stock, of the par value per share of one hundred dollars; and that by reason thereof the plaintiff was entitled to recover from her the sum of twenty thousand dollars, with interest on each half of that sum from the dates they should have been respectively paid, under the notice given by the receiver.

The defendant pleaded, first, that she was never indebted as alleged; second, that she never at any time held or owned shares of stock in this bank, and if it appeared upon its books or otherwise that any of the stock stood in her name, the entries to that effect were fraudulent, and were made for the

purpose of cheating her; third, that since August 15, 1856, she has been the wife of John Hitz. She filed an additional plea, averring that there was not, nor had ever been, any such national banking association as the German-American National Bank, of which the plaintiff was receiver; meaning, by this plea, that no such association was ever organized in conformity with the statutes of the United States.

There was evidence before the jury tending to establish the following facts:

In the year 1872 certain persons, among whom was John Hitz, the husband of the defendant, availed themselves of the provisions of the act of Congress of May 5, 1870, relating to the creation of corporations in the District of Columbia by general laws, as amended by the act of June 17, 1870, and formed a corporation by the name of the German-American Savings Bank of the city of Washington. 16 Stat. 98, 102, c. 80; Ib. 153, c. 131.

There appears, under date of January 21, 1876, upon the books of that bank, labelled "Stock Transfers and Ledger, German-American Savings Bank," entries showing the assignment and transfer to Jane C. Hitz of shares of stock, as follows: 173 shares by John Hitz, 10 shares by William F. Mattingly, (the latter acting by Samuel L. Mattingly, attorney,) 10 shares by R. B. Donaldson and 7 shares by C. E. Prentiss; in all, 200 shares. At the time these transfers purport to have been made, John Hitz was president of the bank, Donaldson vice president and Prentiss cashier; and they, with Mattingly and others, were its trustees. The stubs in the book of transfers state that new certificates for all the above stock were issued to Mrs. Hitz; but it was not distinctly shown that they were delivered to her, or were ever in her possession. It was, however, proven that the fourth dividend upon these shares, amounting to $800, was paid by the check of Prentiss, the cashier of the savings bank, dated May 1, 1876, which was in these words: "Pay to Jane C. Hitz, or order, $800, fourth dividend, payable this day on stock standing in her name on the books of this bank, and charge to dividend account, No. 3300." That check was endorsed: "Pay to the order of John

Hitz. Jane C. Hitz." Then follows this endorsement: "John Hitz, Consul-General," showing, as stated by Prentiss, that the proceeds of the check were deposited by John Hitz to his account in the bank as consul general. Similar checks were made for the fifth and sixth dividends on the same stock. They were payable, respectively, November 1, 1876, and November 1, 1877, and were endorsed in the same way as was the first check. As in the case of the first check, their proceeds were placed to the credit of John Hitz as consul general.

Among the original papers on file in the office of the Comptroller of the Currency were the following:

1. A document dated May 7, 1877, purporting to be signed by the stockholders of the German-American Savings Bank of Washington, then having a capital of $127,100, and to authorize the trustees thereof — John Hitz and others named — to convert that bank into a national banking association, by the name of the German-American National Bank of Washington, and make the articles of association and the organization certificate required by the statutes of the United States. Under the headings in that document of "Names of Stockholders" and "No. of shares owned by each," appear among other names those of John Hitz, 130 shares; R. B. Donaldson, 90 shares; W. F. Mattingly, 190 shares; C. E. Prentiss, 61 shares; John Hitz, trustee, 25 shares; John Hitz and C. E. Prentiss, trustees, 81 shares; and Jane C. Hitz, 200 shares.

2. The organization certificate, signed by the trustees, and verified by their oath, stating that they have been authorized by the stockholders of the German-American Savings Bank to change it into a national banking association, the stock of which shall be divided as it was then divided in the savings bank. That certificate contains a statement of the names, residence and number of shares held by each stockholder of the savings bank, and in the list appears the name of Jane C. Hitz, as holding 200 shares. It bears date May 7, 1877, and was filed with the Comptroller of the Currency May 13, 1877.

3. The articles of association of the German-American National Bank of Washington, which is accompanied by the cer-

tificate of J. S. Langworthy, as acting Comptroller of the Currency, under date of May 14, 1877, stating that that bank had complied with all the provisions of the Revised Statutes, relating to national banking associations, and was authorized to commence business as provided in section 5169 of the Revised Statutes. The national bank had the same officers and trustees as the savings bank.

No direct proof was made by the plaintiff that the signature purporting to be that of the defendant, on the above checks for dividends, was her genuine signature.

In reference to the stock of the German-American Savings Bank which, according to the entries in its books, was transferred by Mr. Mattingly, the latter, as a witness for the defendant, testified that he owned stock in that bank, but that he had never transferred any of it; that he never owned and did not himself transfer ten shares of stock to Mrs. Hitz; and that he did not purchase those shares, and did not know how they happened to stand in his name, although he supposed his brother, who executed the transfer in the witness's name, understood how it all occurred.

Mr. Donaldson testified for the defendant that, while he signed a transfer of ten shares of stock to Mrs. Hitz, he had no recollection whatever of the transaction; that he never owned the stock so transferred; and was never paid for it by any one.

Mrs. Hitz testified in her own behalf. The substance of her testimony was that she never bought, owned or voted any stock in the German-American Savings Bank or in the German-American National Bank; never knew until after the failure of the national bank that her name appeared among the stockholders on the books of either bank; never received any dividend declared or paid by either; and never received or held any certificates of stock in either bank. Being asked as to whether the signature of Jane C. Hitz to the paper purporting to be signed by the stockholders of the German-American Savings Bank, and authorizing its conversion into a national banking association, was her signature, she answered, in substance, that she knew nothing of that paper; did not remember to have signed it, although the signature resembled

hers; was not aware of the conversion of the savings bank into a national bank until after the failure of the latter; and as she never owned any of this stock, she would not have signed any paper for such change, if she had been asked to do so. Being shown the checks for dividends on the stock standing in her name, she stated that she had no recollection of seeing them until after the failure of the German-American National Bank. Again: "Q. What do you say as to the signature — did you write it? A. I cannot say. Q. Did you ever get any money on account of those checks? A. I never did. Q. Those checks appear to have been paid. Do you remember whether you ever had them in your possession or not? A. No, sir, I never had them in my possession. Q. What do you say? A. I am certain I never had them in my possession. Q. Can you account to the jury for the similarity of that signature to your own? A. I cannot. Q. Do you say you never wrote your name on the back of those checks? A. No, sir; I cannot say that. I have no recollection of having done so. I never did so knowing the nature of the checks; never did so at all, so far as I can recollect."

Upon cross-examination: "Q. You are unable to deny that that is your signature? A. I cannot positively deny that it is. Q. Can you deny at all that that is your signature? A. I can deny having any recollection of having signed them. Q. Can you deny that it is your signature? A. I cannot deny it. Q. Now, I will ask you whether, when you were in Europe, the salary of your husband as consul general was not paid to you? A. It was during part of the time that I was there. Q. To what did that salary amount? A. I think $3000."

Upon reëxamination the defendant was permitted, against the objection of the plaintiff, to state that she thought it would be impossible for her to have owned $20,000 of stock in the German Savings Bank and not have remembered it. Being asked whether, if she had seen the checks, she could have forgotten them, she said: "Had I seen them, knowing what they were, I should not have forgotten them — could not have forgotten them."

The foregoing is substantially the case made before the jury.

Before entering upon the examination of the questions raised by the plaintiff's assignments of error, it is necessary to consider certain propositions advanced by the defendant, which, if sound, might be sufficient to dispose of the case.

It is contended that the conversion of the German-American Savings Bank into a national banking association was unauthorized by any statute of the United States, and, consequently, that the appointment by the Comptroller of the Currency of the plaintiff as receiver, and the assessment made by that officer upon the stockholders of the bank — which assessment is the foundation of the present suit — were absolute nullities.

The privilege of becoming a national banking association is given by section 5154 of the Revised Statutes to "any bank incorporated by special law, or any banking institution organized under a general law of any State." These words, it is argued, do not embrace savings banks organized in the District of Columbia, and only to refer to banks or banking institutions created under the authority of some State, either by a special or general law. But all difficulty upon the subject is removed by the act of Congress, entitled "An act authorizing the appointment of receivers of national banks, and for other purposes," approved June 30, 1876, 19 Stat. 63, c. 156, the sixth section of which is as follows :

"That all savings banks or savings and trust companies organized under authority of any act of Congress, shall be, and are hereby, required to make, to the Comptroller of the Currency, and publish, all the reports which national banking associations are required to make and publish under the provisions of sections fifty-two hundred and eleven, fifty-two hundred and twelve, and fifty-two hundred and thirteen of the Revised Statutes, and shall be subject to the same penalties for failure to make or publish such reports as are therein provided ; which penalties may be collected by suit before any court of the United States in the district in which said savings banks or savings and trust companies may be located. And all savings or other banks now organized or which shall

hereafter be organized; in the District of Columbia, under any act of Congress, which shall have capital stock paid up in whole or in part, shall be subject to all the provisions of the Revised Statutes, and of all acts of Congress applicable to national banking associations, so far as the same may be applicable to such savings or other banks: *Provided*, That such savings banks now established shall not be required to have a paid-in capital exceeding one hundred thousand dollars." 19 Stat. 64.

Under that act the German-American Savings Bank was required to make to the Comptroller of the Currency the reports which by sections 5211, 5212 and 5213 of the Revised Statutes were required from national banking associations. It also became subject to all the provisions of the Revised Statutes and of the acts of Congress relating to national banking associations, so far as those provisions were applicable to a savings bank organized in this district. It is too clear for dispute that, after the passage of the act of 1876, savings banks organized in this district under an act of Congress, and having a capital stock paid up in whole or in part, were entitled to become national banking associations in the mode, and subject to the conditions, prescribed by section 5154. Surely that section cannot be deemed inapplicable to savings banks of that class.

Another contention of the defendant is, that the German-American National Bank could not acquire the powers and privileges of a national banking association before receiving from the Comptroller of the Currency a certificate that the provisions of the statute relating to such associations had been complied with, and that it was authorized to commence the business of banking; that the certificate given under date of May 14, 1877, by J. S. Langworthy, as "Acting" Comptroller of the Currency, did not meet the requirements of the statute, because, it is argued, there was no such officer known to the law. Rev. Stat. § 5154. This point was not specifically made in the court below. But there is nothing of substance in it, even if it could properly be raised in this collateral proceeding. There is an officer designated a Deputy Comp-

troller of the Currency, who may exercise the powers and discharge the duties attached to the office of Comptroller, during a vacancy in that office, or during the absence or inability of the Comptroller. Rev. Stat. §§ 178, 327. The certificate alluded to was from the office of the Comptroller, and was under the seal of that office. Besides, this court takes judicial notice of the fact that Mr. Langworthy was, at the date of his certificate, Deputy Comptroller of the Currency. And it will be assumed that, at the date of his certificate, he was authorized to exercise the powers and discharge the duties of the Comptroller, and was therefore, at the time, Acting Comptroller.

It is further insisted that Langworthy's certificate is no part of the transcript. And the defendant has made a motion in this court to strike it from the record. It is clear from the affidavits submitted that the certificate was used at the trial in special term, and that it was accidentally omitted from the bill of exceptions taken by the plaintiff. This omission being discovered before the case was heard in general term, application was made to the trial justice, after the special term had adjourned without day, to amend the bill of exceptions so as to make this certificate a part of it. The application was granted — whether upon notice to the defendant or her counsel is not clearly shown — and the case was heard in the general term without any suggestion, so far as the record shows, that the certificate had been improperly made a part of the record after the bill of exceptions had been completed and signed. An objection of that character will not be considered where it was not presented to the court whose judgment is here for review. The record must be taken as it was presented to the general term.

We now proceed to consider the principal questions arising upon the requests for instructions and upon the charge of the court to the jury.

At the instance of the defendant the jury were instructed substantially as follows:

That if the stock in controversy was transferred upon the books of the German-American Savings Bank to and in the

name of the defendant without her knowledge and consent, she was entitled to a verdict, unless she subsequently ratified and confirmed such transfer ;

That if the defendant was procured to sign the application to the Comptroller of the Currency for the organization of the German-American National Bank by fraudulent means and representations, such application must not be taken as confirming the transfer of the stock to her on the books of the savings bank ;

That if the defendant was induced to endorse the three checks for dividends by means of fraud or misrepresentation, or by concealing from her the facts concerning them, such checks cannot be regarded as a confirmation of a transfer of the stock to her name, nor as evidence against her ;

That if the stock was transferred to the defendant for fraudulent purposes, by or at the instigation of her husband, and without her knowledge or consent, such transfer was void, and she was entitled to a verdict ; and,

That if, at or before the time of the transfer of the stock to the defendant on the books of the company, she had not purchased the stock or authorized it to be purchased, either directly or indirectly, and knew nothing about it, she was not liable, as a shareholder, to the assessment in question.

These instructions were, in effect, repeated in the elaborate charge to the jury.

The testimony of the defendant tended to show that the stock was originally transferred to her on the books of the German-American Savings Bank, without her knowledge or consent ; and the issue upon that point was fairly submitted to the jury by the first instruction given at her instance. But some of the instructions given upon her motion, as well as the charge to the jury, erroneously assumed that there was evidence tending to show that she was procured, by fraudulent means and representations, to sign the application for the conversion of the savings bank into a national bank ; that, by like means, or by concealment of the facts, she was induced to sign the checks for dividends ; and that the transfer of the stock to her name was for fraudulent purposes, by or at the

instigation of her husband.    There was, however, no evidence as to the circumstances under which her name was signed to the application addressed to the Comptroller, or under which the checks were endorsed in her name; absolutely none upon which to base the theory of fraud or false representations. It is true, as already suggested, there was evidence tending to show that the transfers of stock were made originally without defendant's knowledge; and the jury might reasonably have concluded, under all the evidence, that the transfers were made, and caused to be made, by her husband.    But these facts neither proved, nor tended to prove, fraud upon the part of the husband.    There was no proof that he was insolvent, and, therefore, it could not be presumed that the transfers were made with any intent to defraud his creditors.    Besides, the intent with which the husband caused the transfers to be made to his wife was wholly immaterial.    Even if the object was to conceal his property from creditors, the vital question remained whether the defendant became the owner of the stock within the meaning of the statute regulating the individual liability of the shareholders of national banking associations.    In other words, the husband may have intended to commit a fraud upon his creditors, and the transfers of stock may have been made to the wife without first obtaining her consent; and yet she may have been, at the time of the bank's failure, liable to be assessed as a shareholder.    There was no connection between her liability to be so assessed, and the alleged fraudulent intent with which the husband caused the transfers of stock to be made.

Whether she signed the application for the conversion of the savings bank into a national bank in the capacity of shareholder to the extent of two hundred shares, was wholly apart from any question of her knowledge, at the time of the transfers, of the motive which induced her husband in making or causing them to be made.    If she became aware of the transfers, after they were made, and thereafter received the dividends, she became a shareholder for all purposes of individual liability in respect to the contracts, debts and engagements of the bank, as fully as if the transfers had been made originally

with her knowledge and consent. Whether she received the dividends or not depended upon the inquiry as to whether the checks for them were endorsed by her. If she endorsed them, or either of them, she is estopped to say that she did not know their contents, and was not the owner of the shares of stock upon which the dividends were declared; for each check discloses upon its face that it was payable to her order, and was for dividends on stock standing in her name on the books of the bank. This result is not at all affected by the fact that the proceeds of the checks went to the credit of John Hitz's account as consul general. If the defendant endorsed the checks in blank or to the order of her husband, and delivered them to him, the mode in which he disposed of the proceeds is of no consequence in the present suit.

We must not be understood as saying that the *mere* transfer of the stocks on the books of the bank, to the name of the defendant, imposed upon her the individual liability attached by law to the position of shareholder in a national banking association. If the transfers were, in fact, without her knowledge and consent, and she was not informed of what was so done — nothing more appearing — she would not be held to have assumed or incurred liability for the debts, contracts and engagements of the bank. But if, after the transfers, she joined in the application to convert the savings bank into a national bank, or in any other mode approved, ratified or acquiesced in such transfers, or accepted any of the benefits arising from the ownership of the stock thus put in her name on the books of the bank, she was liable to be treated as a shareholder, with such responsibility as the law imposes upon the shareholders of national banks.

The arguments of counsel were partly directed to the question whether new certificates of stock were issued by the savings bank, and delivered to the defendant, after the transfers were made on the books of that bank. It is sufficient, on this point, to say that the record made of the transfers upon the books of the bank was sufficient, as between her and the bank, to work a change of ownership, and new certificates were not necessary to her becoming the owner of the stock

so transferred. Nor can she escape liability by reason of the fact, if such be the fact, that no certificates were issued to her by the German-American National Bank. The statute expressly declares that the shares of the old bank may continue to be for the same amount each as they were before the conversion.

One other question raised by the defendant requires consideration. She contends that her coverture, at the time of the transfers, as well as when the bank failed, protected her against assessment upon the stock put in her name upon the books of the bank. The plaintiff's requests for instructions upon this point having all been granted by the court below, it is suggested that no question can arise upon the assignments of error in reference to the individual liability of married women for the debts, contracts and engagements of national banking associations of which they are shareholders. But if the defendant's position is correct, the judgment might be affirmed upon the ground that she was not, under any circumstances, liable to an assessment by the Comptroller. For this reason, and because this question will necessarily arise upon another trial, it is proper to give it some attention.

We do not understand the defendant to say that she was incapacitated by the laws in force in the District of Columbia from becoming the owner of bank stock. It was well said by Mr. Justice Cox, when the present case was first before the general term, *Keyser* v. *Hitz*, 2 Mackey, 473, 493, that "a married woman "has the legal capacity to receive gifts, may be the obligee of a bond, or receive a transfer of stock in moneyed corporations, and this though the consideration may have proceeded wholly from the husband, and in such case she may hold against the legatees and heirs, but not against the creditors of the husband. *Fisk* v. *Cushman*, 6 Cush. 20." We speak of gifts, because the reasonable inference from all the evidence is that the defendant's husband made and caused to be made the transfers in question as a gift, though not, so far as the record shows, to her sole and separate use.

Assuming, then, that she was not incapacitated from becoming the owner of stock in a bank, and that she was a

shareholder in the savings bank, she became, upon the conversion of that bank into a national bank, a shareholder in the latter. Rev. Stat. § 5154. In that event she became, by force of the statute, individually responsible to the amount of her stock, at the par value thereof, for the contracts, debts and engagements of the national bank equally and ratably with other shareholders. Section 5151, which imposes such individual responsibility upon the shareholders of national banks, makes no exception in favor of married women. The only persons holding shares of national bank stock, whom the statute exempts from this personal responsibility, are executors, administrators, guardians, or trustees. § 5152. It is not for the courts, by mere construction, to recognize an exemption which Congress has not given. The hardship that may result where the ownership of national bank stock by a married woman is subject to the common law rights of the husband, in respect to its alienation, cannot control the interpretation of the statute. Such considerations are more properly for the legislative department. Upon this point, the case of the *Reciprocity Bank*, 22 N. Y. 9, 15, which involved the liability of a married woman as a shareholder in a state bank, is instructive. The constitution and statutes of New York made the shareholders in corporations and joint stock associations, for banking purposes, issuing bank notes, "individually responsible," etc. The Court of Appeals of that State, speaking by Chief Judge Comstock, said : "It is also said that *femes covert* are not liable to suit or judgment at the common law ; and in general, this is true. It is also true that the apportionment of liability among stockholders in banks, when duly confirmed, becomes a judgment against each stockholder, to be enforced by execution as in other cases. But it was competent for the legislature to depart from the rules and analogies of the common law, and to make married women and their estates liable in this proceeding, as other stockholders in banks are made liable. This, we think, has been done, and it seems to us proper to add, that we see no reason why it ought not to be done, in order to effectuate the policy on which the constitutional provision and the statute are founded. It might go

far to defeat that policy, if married women could take and hold stock without liability to the creditors." See also, *Sayles* v. *Bates*, 15 R. I. 345.

This question arose in *Anderson* v. *Line*, in the Circuit Court of the United States for the Eastern District of Pennsylvania, where it was held by Judge McKennan, that a married woman was not exempted by reason of her coverture from the liability imposed by Congress upon shareholders in national banks. 14 Fed. Rep. 405. To the same effect is the decision of Judge Wheeler in *Witters* v. *Sowles*, 32 Fed. Rep. 767.

We are of opinion that the coverture of the defendant did not prevent the plaintiff from recovering a judgment against her for the amount of the assessment in question, if she was, within the meaning of the statute, a shareholder in the bank at the time of its suspension. But the question as to what property may be reached in the enforcement of such judgment is not before us, and we express no opinion upon it.

For the above errors committed by the court below in its instructions to the jury, the judgment is

*Reversed, with directions to grant a new trial, and for further proceedings consistent with this opinion.*

MR. JUSTICE MILLER dissented.