## Northampton Trust Company's Petition.

*H. J. Steele*, for petitioner; *Robert W. Bowlby*, contra.

*Cyrus E. Woods*, Attorney-General, and *Harold D. Saylor*, Deputy Attorney-General, for Commonwealth, intervening.

STEWART, P. J., March 10, 1930.—The Northampton Trust Company presented a petition setting forth that it was duly incorporated and organized on April 3, 1902, under the laws of this Commonwealth providing for the incorporation of trust companies; that the First National Bank of Easton was duly incorporated and organized under the laws of the United States as a national bank; that under an Act of Congress of Feb. 25, 1927, ch. 91, 44 Stat. at L. 1224, amending the Act of Nov. 7, 1918, ch. 209, 40 Stat. at L. 1043, by adding a new section, known as section 3 thereto, the consolidation of a trust company into a national banking association was authorized; which section, in part, reads as follows: "That any bank incorporated under the laws of any state, or any bank incorporated in the District of Columbia, may be consolidated with a national banking association located in the same county, city, town, or village under the charter of such national banking association on such terms and conditions as may be lawfully agreed upon by a majority of the board of directors of each association or bank proposing to consolidate. . . . The capital stock of such consolidated association shall not be less than that required under existing law for the organization of a national banking association in the place in which such consolidated association is located; and all the rights, franchises, and interests of such state or district bank so consolidated with a national banking association in and to every species of prop-

erty, real, personal, and mixed, and choses in action thereto belonging, shall be deemed to be transferred to and vested in such national banking association into which it consolidated without any deed or other transfer, and the said consolidated national banking association shall hold and enjoy the same and all rights of property, franchises, and interests, including the right of succession as trustee, executor, or in any other fiduciary capacity in the same manner and to the same extent as was held and enjoyed by such state or district bank so consolidated with such national banking association. . . . No such consolidation shall be in contravention of the law of the state under which such bank is incorporated. The words 'state bank,' 'state banks,' 'bank,' or 'banks,' as used in this section, shall be held to include trust companies, savings banks, or other such corporations or institutions carrying on the banking business under the authority of state laws." The petition further alleged that at a duly convened meeting of the stockholders of the trust company, 2371 out of a total of 2500 shares (no shares being voted to the contrary) voted for the consolidation of the trust company into the national bank, under the charter of the First National Bank of Easton, and under the title of the First National Bank & Trust Company of Easton; that, on July 1, 1929, the capital stock of the bank was $400,000, and the capital stock of the trust company was $125,000, and after the consolidation the capital stock of said bank was increased to $600,000, and the stockholders of the said trust company assigned and transferred their shares to the bank, and the same were canceled under the terms of the agreement for the consolidation of the two institutions, and the trust company stockholders received in lieu of their stock, stock of the consolidated bank. On July 1, 1929, the Comptroller of the Currency in the Treasury Department of the United States issued his certificate of approval of such consolidation. The petition further alleged that the Pennsylvania Department of Banking, on Nov. 1, 1929, wrote the president of said consolidated bank a letter, enclosing "a copy of the opinion rendered by the Department of Justice, in which we are advised that the corporate existence of a state bank or trust company that is consolidated with a national banking association should be dissolved by the court. We request, therefore, that you proceed under the provisions of the Act of Assembly approved April 9, 1856, P. L. 293, to petition the court for the dissolution of the trust company. If such action is not taken, it will be our duty to advise the attorney-general to institute *quo warranto* proceedings." The president of said bank thereupon directed the present proceedings to be begun. The petition further alleged that the Northampton Trust Company, at the time of its consolidation, had no debts or liabilities whatsoever, and that all taxes due to the Commonwealth had been duly paid. The petition for dissolution was signed Northampton Trust Company, by Chester Snyder, Secretary, and the seal of the corporation was attached.

The First National Bank & Trust Company of Easton demurred to the petition, assigning ten causes of demurrer. The eighth is as follows: "The Act of April 26, 1889, P. L. 56, applies only to banking institutions; and as the Act of May 9, 1889, P. L. 159, expressly forbade trust companies from doing a banking business, it has no application to trust companies, and there is no such state legislation applicable to trust companies." That act was referred to in the opinion of the Department of Justice: In re Consolidation of State and National Banks, 12 D. & C. 626. After discussing the Act of Congress above quoted and the two cases of Petition of Worcester County National Bank of Worcester, 263 Mass. 394, 161 N. E. Repr. 797, and 263 Mass. 444, 162 N. E. Repr. 217, and Ex parte Worcester County National Bank of

Worcester, 279 U. S. 347, the opinion ends as follows: "The only statute in Pennsylvania relative to the disposition of the charter of a state bank upon its affiliation with a national bank is the Act of April 26, 1889, P. L. 56, which provides a method for the surrender of the charter of a state bank upon its becoming a national banking association, but the surrender takes place only upon compliance with the requirements of the act. If, therefore, in any case in which a bank or trust company of this Commonwealth is consolidated with a national banking institution under the Act of Congress referred to above the provisions of the Act of 1889, just referred to, are also followed, a surrender of the charter of the state bank or trust company will necessarily follow. You are, therefore, advised that, unless the provisions of the Act of April 26, 1889, P. L. 56, are followed, the consolidation of a state bank or trust company with a national bank under the Act of Congress of Feb. 25, 1927, does not void the charter or terminate the corporate existence of such state bank or trust company. Proceedings should be taken by the proper officers of the state institution to effect a voluntary dissolution under the provisions of the Act of April 9, 1856, P. L. 293. If such proceedings are not taken, you should return such institution to the Attorney-General, under the provisions of section 17 of the Banking Act of 1923 (Act of June 15, 1923, P. L. 809), as amended by the Act of May 5, 1927, P. L. 762, for the institution of *quo warranto* proceedings." The Act of April 26, 1889, P. L. 56, is entitled: "An Act enabling the banks of this Commonwealth to become associations for the purpose of banking under the laws of the United States." Throughout the act, in none of its eleven sections, is any reference made to trust companies, and the reason was that at the time of the passage of that act there was no general legislation for the incorporation of trust companies. Their history will be found in 2 Eastman on Corporations, page 1274. In general, trust companies had to incorporate under the Act of 1874 and then accept the provisions of the Act of May 9, 1889, P. L. 159. The second paragraph had a proviso, as follows: "Provided, that nothing herein contained shall authorize said companies to engage in the business of banking." Under the Act of Congress of Nov. 7, 1918, two or more national banks in the same locality were permitted to consolidate, but until the enactment of the McFadden Bill, Feb. 25, 1927, there was no provision for a state bank or trust company to consolidate directly with a local national bank, and it was necessary for the former first to become converted into a national bank by an intricate and expensive process. To remove all doubt, the Act of 1927 specifically mentioned trust companies. We have here the situation that when the Act of April 26, 1889, was passed there was neither state nor Federal legislation relating to trust companies, neither can the word "banking" be construed to include trust companies. See 7 Corpus Juris, 881, § 970; Nash v. Brown, 165 Mass. 384; Mercantile Bank v. New York, 121 U. S. 138. It is plain that it would have no application to a trust company if its provisions had been invoked, and the learned deputy attorney-general, upon the argument, admitted that the Act of 1889 had no application to the present case. The present petition is presented under the Act of April 9, 1856, P. L. 293.

The first, fifth, sixth, seventh, ninth and tenth causes of demurrer are as follows:

"First. That upon the face of the petition the petitioner is not entitled to the relief claimed. . . .

"Fifth. The contract of consolidation was an act of dissolution of the trust company, and when complete on July 1, 1929, it destroyed the stock and transferred all property rights to the respondent.

"Sixth. It is the duty of the court, before it can enter a decree of dissolution, to see that the public welfare and interests of the corporators suffer no prejudice by reason of such act; and the respondent, as successor of said corporators, would be prejudiced by reason of such decree.

"Seventh. The Act of 1856 has no application to the state of facts set forth in the petition. . . .

"Ninth. The effect of the consolidation authorized by the Act of Congress of February 25, 1927, was to extinguish the trust company, and all its property became the property of the respondent.

"Tenth. The said trust company having been extinguished under the agreement of consolidation, and its approval by the Comptroller of the Currency, there is no authority to dissolve an already dead corporation."

They raise the important questions to be decided.

We have examined the Act of 1856 with care in Easton Transit Company's Petition, 17 Northamp. Co. Repr. 244, affirmed in 270 Pa. 136. In that case Mr. Justice Simpson said: "Under the Act of April 9, 1856, P. L. 293, the only question to be determined on the hearing of a petition by a corporation for leave to surrender any power contained in its charter, is whether or not such surrender may be granted without prejudice to the public welfare or the interests of the corporators." In Bangor Electric Company's Petition, 21 Northamp. Co. Repr. 317, affirmed in 295 Pa. 228, the second syllabus is the same as in the above case. An examination of the act itself shows that a live corporation, and not a dead one, is contemplated. There must be a meeting of the corporators, and a majority must pray for permission either to surrender a power contained in the charter, or for the dissolution of the corporation. It provides for passing on accounts of the managers, directors or trustees, and for dividends of the effects, if any, to the corporators. Omitting the impracticability of having the old stockholders meet after they have surrendered their stock and the same has been canceled and destroyed, and confining our attention only to the provisions of the act in reference to the division of the assets, it will be seen that the act was not intended to apply to a case like the present.

Section 17 of the Act of June 15, 1923, P. L. 809, as amended by the Act of May 5, 1927, P. L. 762 (the only change made by the latter act was to omit the words "after having been liquidated"), may, after two years from July 1, 1929, be invoked by the attorney-general, but that act is not now before us. In our examination we fail to see that there is any necessity for further proceedings to dissolve the trust company for the following reasons: in Ex parte Worcester County National Bank, 279 U. S. 347, the lower court decided, quoting from Mr. Chief Justice Taft's opinion, as follows: "The third question the court discussed and decided was the validity and binding effect on courts of Massachusetts of the declaration in section 3 of the Act of Congress that the right of succession as trustee, executor or in any other fiduciary capacity, would follow to the same extent as it was held and enjoyed by such state bank. It first inquired what was its meaning, and held that it meant that the original appointment of the state bank was to continue wholly unaffected by the fact that the state bank had ceased to be, and that another and different corporation, whose credit, standing and competency had never been the subject of judicial inquiry for this purpose, must be substituted by virtue of section 3. The court found that this result was in contravention of the law of the commonwealth and contrary to the state and Federal Constitutions." Again, he said: "In passing on this appeal, we must observe that in determining the policy of a state from its statutes and their construction,

we, of course, follow the opinion of the state court, except as it may be affected by the Federal Constitution. When, therefore, the state court holds that an executor, to act as such in the state, must be appointed by the probate court, this court must respect that conclusion and act accordingly. But when the question arises as to what is the proper interpretation and construction of Federal legislation, this court adopts its own view. It is very clear to us that Congress in the enactment of section 3 in the Act of February 25, 1927, was anxious even to the point of repetition to show that it wished to avoid any provision in contravention of the law of the state in which the state trust company and the national bank to be consolidated were located. So strongly manifest is this purpose that we do not hesitate to construe the effect of section 3 in Massachusetts to be only to transfer the property and estate from the trust company to the national bank to be managed and preserved as the state law provides, for administration of estates, and not to transfer the office of executor from the state trust company to the succeeding national bank." The sole matter decided is contained in the last few lines. The *corpus* of the estate passed to the bank, but not the office of executor. The Chief Justice nowhere said that the trust company in that case was to be considered alive for the purpose of settling the estate, but he said that the trust company was dead, defunct, but that the bank could not act as executor because under the Massachusetts law an executor must be appointed by a probate court. In the strongest possible way, he said that the entire section 3, quoted above, was constitutional. The view of the Supreme Court of the United States is binding upon our courts. Turner's Estate, 277 Pa. 110, was a case in which it was decided that a national bank, if it complied with certain provisions, might act as a fiduciary in Pennsylvania. The syllabus of the case is: "If there is any inconsistency between the state acts and the federal acts, the former must yield to the latter. It is not beyond the power of a national bank to agree to comply with state regulations as to fiduciaries where they are in conflict with federal practice. Differences in administrative details between federal and state regulations are not sufficient to deprive a national bank of its powers under the federal laws. The establishment of the Federal Reserve Board was a matter within the scope of the federal power, and a state cannot, in any way, interfere with the powers of such board, except in so far as Congress has permitted the states to do so. The courts will assume that Congress, in enacting the Act of Sept. 26, 1918, 40 Stat. 967, was satisfied with the rules prescribed by the Federal Reserve Board. If these rules conflict with state regulations, the latter must yield to the former, because, the right being conceded, the power to regulate the exercise of the right would follow as a necessary incident." It has even been decided that no authority other than that conferred by Congress is required to enable a bank or trust company, existing under a general state law, to become a national banking association, and the certificate of the Comptroller of the Currency is conclusive as to the regularity of the proceedings by which the conversion was effected: Casey *v.* Galli, 94 U. S. 673; Keyser *v.* Hitz, 133 U. S. 138. In Farmers' and Mechanics' National Bank *v.* Dearing, 91 U. S. 29, Mr. Justice Swayne said: "The constitutionality of the Act of 1864 is not questioned. It rests on the same principle as the act creating the second bank of the United States. The reasoning of Secretary Hamilton, and of this court, in McCulloch *v.* Maryland, 4 Wheat. 316, and in Osborn *v.* Bank, 9 Wheat. 738, therefore, applies. The national banks organized under the act are instruments designed to be used to aid the government in the administration of an important branch of the public service. They are means appro-

priate to that end. Of the degree of the necessity which existed for creating them, Congress is the sole judge. Being such means, brought into existence for this purpose, and intended to be so employed, the states can exercise no control over them, nor in any wise affect their operation, except in so far as Congress may see proper to permit. Anything beyond this is 'an abuse, because it is the usurpation of power which a single state cannot give.' Against the national will 'the states have no power, by taxation or otherwise, to retard, impede, burthen or in any manner control the operation of the constitutional laws enacted by Congress to carry into execution the powers vested in the General Government:' Bank of the U. S. v. McCulloch, *supra;* Weston v. Charleston, 2 Pet. 466; Brown v. Maryland, 12 Wheat. 419; Dobbins v. Erie Co., 16 Pet. 435. The power to create carries with it the power to preserve. The latter is a corollary from the former." The whole purpose of the union between this trust company and the bank having been to continue the bank as a live corporation, and the words being as broad as they are; "every species of property, real, personal, and mixed, and choses in action thereto belonging, shall be deemed to be transferred to and vested in such national banking association into which it is consolidated without any deed or other transfer, and the said consolidated national banking association shall hold and enjoy the same and all rights of property, franchises, and interests including the right of succession as trustee, executor, or in any other fiduciary capacity in the same manner and to the same extent as was held and enjoyed by such state or district bank so consolidated with such national banking association," the only way in which the identity of the trust company could be preserved would be by showing that such a consolidation was in contravention of the law of the state under which such bank was incorporated. No such state statute has been cited to us, and our examination has not found any. Some light as to the effect of this consolidation may be had by examining some of the authorities on the subject of merger and consolidation of companies. In Central R. R. and Banking Co. v. Georgia, 92 U. S. 665, it is said that whether the consolidation of two corporations works a dissolution of them both and creates a new corporation, "must depend upon the statute under which the consolidation takes place and the intention therein manifested." In Shields v. Ohio, 95 U. S. 319, Mr. Justice Swayne said: "This renders it necessary to consider the legal status and character of the new corporation. In the present state of the law, a few remarks upon the subject will be sufficient. The legislature had provided for the consolidation. In each case, before it took place, the original companies existed and were independent of each other. It could not occur without their consent. The consolidated company had then no existence. It could have none while the original corporations subsisted. All—the old and the new—could not co-exist. It was a condition precedent to the existence of the new corporation that the old ones should first surrender their vitality and submit to dissolution. That being done, *eo instanti* the new corporation came into existence." Again, he said: "When the consolidation was completed, the old corporations were destroyed; a new one was created, and its powers were 'granted' to it, in all respects, in the view of the law, as if the old companies had never existed, and neither of them had ever enjoyed the franchises so conferred. The same legislative will created and endowed the new corporation. It did one as much as the other. In this respect, there is no ground for any distinction. These views are sustained by several well-considered cases exactly in point. One of them embodies the unanimous judgment of this court: Clearwater v. Meredith, 1 Wall. 25; McMahan v. Morrison, 16 Ind. 172; The State of Ohio v.

358

Sherman, 22 Ohio St. 411; Shields v. The State of Ohio, 26 Ohio St. 86." In Keokuk & Western Railroad Co. v. Missouri, 152 U. S. 301, Mr. Justice Brown reviews all the authorities on this subject, and the result of his decision is that it depends upon the statute which authorized the consolidation. He said: "It is impossible to conceive of a corporation existing without stock, or certificates representing the interests of the corporators in the organization. Now, if the act provides that these certificates shall be surrendered, and certificates in another company issued in their place, what becomes of the prior companies? Who are their stockholders—who their officers? If the stock in the new company is sold, what interest in the prior companies passes by the sale? There can be but one answer to these questions. The property and franchises of the prior companies are gone as much as if they had formally surrendered their charters. The new company may doubtless receive by transmission from its constituent companies their property, rights, privileges and franchises, including any immunity from taxation: but it receives them as an heir receives the estate of his ancestor, or as a grantee receives the estate of his grantor, by inheritance, succession or purchase." In Lauman v. Lebanon Valley R. R. Co., 30 Pa. 42, the legislature authorized the Lebanon Valley Railroad Company to consolidate with the Philadelphia & Reading Railway Company, and a dissenting stockholder asked for an injunction to restrain the consolidation, and, inasmuch as the court held that the consolidation in effect destroyed his stock, the injunction was issued, but to be dissolved on giving security to pay for said stock upon its value being ascertained. In the course of the opinion, Mr. Chief Justice Lowrie said: "The contract of consolidation is an act of dissolution in form and substance of the Lebanon Company, and the corporation cannot in the act of dissolution dispose of the rights of its members. . . . The act of dissolution works a change in the form of the interests of its members by destroying the stock and substituting the thing which the stock represented, that is, a legal interest in the property, and leaves the members to such a division of this. . . . The act of transfer and dissolution is one. If carried into effect it destroys his stock." Lauman v. Lebanon Valley R. R. Co. has been cited with approval in many cases. In Petry et al. v. Harwood Electric Co., 280 Pa. 142, there was a contract between a corporation and its preferred stockholders. The common stockholders brought about a merger with other corporations. It was held that the merger worked a dissolution. On page 147, the very words that we have quoted from the Lauman case were quoted by Mr. Justice Schaffer to show that there was a dissolution in that case. In Houston et al. v. Jefferson College, 63 Pa. 428, three bills were filed. The particulars of the bills are given at the opening of the opinion. Jefferson College and Washington College were merged under the name of Washington and Jefferson College. The second bill was filed by the trustees of Jefferson College. Mr. Chief Justice Thompson said, in reference to that bill: "As to the second of the above-mentioned bills, viz.: The Trustees of Jefferson College v. Washington and Jefferson College, but little is required to be said. We have virtually decided it, in holding, as we have done in the first of these cases, that by the acceptance of the Act of 1865 in connection with Washington College, it ceased to exist under its original charter. There is, therefore, now no such board as the trustees of Jefferson College, with the right of suit in the name of that corporation: 8 Peters, 281. Consequently, the plea of the defendant is sustained, and this bill must be dismissed." What is there said would apply to the present petition. There is now no such officer as secretary of the trust company. On the general subject, Mr. Chief Justice Thomp-

son said: "The general right of a private corporation to surrender its franchises may possibly have exceptions, but undoubtedly it is the rule. This is generally described as an inherent right, which would necessarily defeat any attempt by legislation to enforce upon a corporation qualities of perpetuity. Such a thing would be impossible in the nature of things. Corporations, like individuals, die by the decay, or loss of their vital functions, and this effectually defies authority, to render them perpetual. A surrender of a franchise is the voluntary death of the corporation, and is one mode by which it may cease to exist: 19 John. 474; 8 Pet. 281. If anybody ever did dispute the right of a corporation to surrender its franchises of its own mere motion, it is not likely that such a contest about the question could be long maintained, where both parties, the state and the corporation, the grantor and grantee, consent to it, absolutely, or on condition." In the opinion referred to in the pleadings, the learned deputy attorney-general said: "On the other hand, it would seem to be contrary to every principle of law that a corporation created under the laws of one sovereignty could be dissolved and its corporate existence terminated by virtue of the provisions of a law of another sovereignty in the absence of the express consent, evidenced by legislative enactment, of the sovereignty creating such corporation. We can see no escape from this proposition, and it is supported by the authority above cited."

We think, after having read the decisions above, that entirely too much importance is attached to the matter of the dissolution of a corporation. All the authorities are to the effect that it may happen, either by act of the parties interested, or by the act of the law. If a bank, chartered under the state, can become a national bank without consulting the state, by virtue of a National Banking Act, why cannot a trust company merge with a national bank without the consent of the state, under the provisions of section 3, *supra*, even if such merger works a dissolution of the trust company? See opinion of Mr. Chief Justice Rugg in 162 N. E. Repr. 217. When the state takes the position which seems to have been taken by the Massachusetts court, that the franchise directed to be transeferred to the national bank, does not mean its charter or its right to be a corporation, is not such a position an interference with a result authorized by Congress, of the same character as those frowned upon in N. P. R. Co. *v.* North Dakota, 250 U. S. 135; Telephone Co. *v.* South Dakota, 250 U. S. 163; Second Employers' Liability Cases, 223 U. S. 1; First National Bank *v.* Fellows, 244 U. S. 416, and Missouri ex rel. Burnes National Bank *v.* Duncan, 265 U. S. 17? There seems to us to be no difference in principle. We do not think that the state can compel the trust company to proceed under the Act of 1856.

The mere fact that there is on our statute books the Act of 1856, providing for a voluntary surrender, and the Act of 1927, providing for an adverse proceeding by the attorney-general, does not make such consolidation "in contravention of the law of the state under which such bank is incorporated."

The petition avers that the trust company has paid all taxes due the Commonwealth, and that it has no outstanding liabilities of any kind. For the purpose of getting the name "Northampton Trust Company" off of the records at Harrisburg, if that has not already been accomplished by filing the certificate of the comptroller of the currency, then the state will have to act by the attorney-general under the Act of May 5, 1927, P. L. 762, *supra.*

We have been furnished with an opinion by Judge Fox, of Dauphin County, in Commonwealth of Pennsylvania *v.* Safe Deposit Bank and Trust Company, 14 D. & C. 267. Judge Fox said: "The Commonwealth is asking for a decree

of ouster in this case to which the defendant makes no serious objection." The learned judge did say that the defendant could have surrendered its charter under the Act of 1856, yet it is obvious that he had in mind only section 17 of the Act of 1923 in his decision. We do not understand why there is such vigorous opposition to the present proceeding, nor what is to be gained by a two years' delay in this matter, but presume that when the attorney-general commences his proceeding in Dauphin County against this trust company, the same position with respect to the effect of the Federal act will be taken there, and that is our only excuse for such an extended discussion as above.

And now, March 10, 1930, this cause came on to be heard at this term, and was argued by counsel, and upon consideration thereof, it is ordered, adjudged and decreed that the first, fifth, sixth, seventh, ninth and tenth causes of demurrer be allowed, and that the petition be dismissed with costs.

The prothonotary will enter this decree *nisi*, and give notice of same to parties or their counsel, and if no exceptions are filed within ten days, this decree shall be entered by him as a final decree.

From Henry D. Maxwell, Easton, Pa.