**SHREVEPORT ENGRAVING CO., Inc., v. UNITED STATES.**

**No. 10924.**

Circuit Court of Appeals, Fifth Circuit.

June 1, 1944.

Rehearing Denied July 7, 1944.

· Ben F. Roberts and Frank J. Looney, both of Shreveport, La., for appellant.

Malcolm E. Lafargue, U. S. Atty., of Shreveport, La., for appellee.

Before HUTCHESON, HOLMES, and WALLER, Circuit Judges.

HUTCHESON, Circuit Judge.

Acquitted on Count One, and convicted on Counts Two and Three, of an information[1] charging it with violations of conservation orders and directives, issued under the War Powers Acts,[2] defendant, a Louisiana corporation, using copper plate in its business of engraving, has appealed. Its assigned errors range from a claim of the complete nullity of the orders, and, therefore, of the information, through claims of error in rulings on evidence in connection with charges, given and refused, to a claim of general unfairness in the conduct of the trial. Its chief reliance for reversal, however, is on, and its brief is mainly devoted to, the point taken by demurrer and by motion for directed verdict, the want of legal authority for, and, therefore, the nullity of the orders.

In thus pitching its attack, appellant is well advised. For, considered as a whole and in the light of the settled rules of law governing review of and reversal for trial errors, the record leaves in no doubt: that the orders and directives were not complied with; that the trial was fairly conducted; that no evidence was admitted which should have been excluded, none excluded which should have been admitted; that the charge of the court fairly submitted to the jury, and the jury fairly determined the issues raised by, the evidence; and that, unless the orders and directives were invalid so that their violation constituted no offense, the judgment must be affirmed.

There are four grounds of attack. One is that the orders or directives, whose violation is charged, are not in conformity with the statute, in that the statute authorized the "allocation", that is the distribution, of critical materials, it did not authorize restrictions upon their use in the hands of those who already had them. It is, therefore, urged that the directives, in restricting defendant's use of its own copper on hand when they were issued, were not an exercise of the power to allocate critical war material, they were an unauthorized attempt to expropriate and confiscate defendant's right to the use without waste of a part of its stock of copper. Another ground of attack is that the directives and orders were invalid, arbitrary, and unreasonable, in that they bore no reasonable relation to the statutory purpose, the conservation of material, here copper, but on their face and in their effects, instead of conserving copper, they really contributed to its waste by preventing the owner from converting the plates into scrap and thus creating a copper content.

■ We need not write much with respect to these two grounds, for we think it clear that they are advanced under a misconception of the purposes and meaning of the War Powers Acts in respect both of the powers sought to be, and in fact, conferred, and of the prescribed manner of their exercise. Drawn to deal comprehensively and effectively with the manifold problems arising in connection with securing the free flow of materials needed for the war effort, they were not drawn to be dissected under a microscope. They were drawn to be considered as a whole

---

[1] Count One Dealing with the fourth calendar quarter of the year 1942, Count Two with the first calendar quarter of 1943, and Count Three with the second calendar quarter of 1943, charged the defendant with using copper in excess of its allowable quota for three periods.

[2] Sec. 301 of the Second War Powers Act of 1942, 56 Stat. 177, 50 U.S.C.A. Appendix, § 633, amending an act "to expedite national defense, and for other purposes", June 28, 1940, 54 Stat. 676, § 2(a) (2), as amended May 31, 1941, 55 Stat. 236, 50 U.S.C.A. Appendix, § 1152.

in the light of the great, the overriding, purpose of their enactment, and of the compelling necessities which called them into being. The critical language:

"Whenever the President is satisfied that the fulfillment of requirements for the defense of the United States will result in a shortage in the supply of any material or of any facilities for defense or for private account or for export, the President may allocate such material or facilities in such manner, upon such conditions and to such extent as he shall deem necessary or appropriate in the public interest and to promote the national defense." 50 U.S. C.A.Appendix, § 1152, Subd. (a) (2).

was carefully drawn to have, it has, a meaning wide enough to comprehend and bring within its effective scope both the distribution and the use of on hand materials essential to the war effort, without regard to whose hands they were in or whether they were being held for use or for sale. It is quite plain, too, that the acts were drawn to confer, and they did confer, the fullest authority in devising means deemed appropriate to the desired end, that nothing in them supports the view that only the best means could legally be employed, and that appellant's second ground of attack amounts to no more than this, that the orders in question are beyond the authority of the act because it can be demonstrated that better directives, more productive of the desired results, could have been laid down. We, therefore, reject as wholly without merit appellant's contentions one and two, that the orders and directives in question are not in conformity with, find no support in, the statute.

■ The third ground, that the directives are invalid because, without prescribing rules and regulations for their exercise, the President attempted to delegate to others the power conferred upon him, is no better taken. It is not claimed, indeed it could not be, that conferring the authority to allocate was a delegation of legislative powers. The claim merely is that the President was appointed personally as agent to carry out the congressional will, and he has not done this, but has passed the agency on to others without complying with the provision of the Act authorizing him to do so, that is without prescribing governing rules and regulations. So much has been written from the foundations of the government to the present [3] that we need write little to show that the maxim, "Delegata potestas non potest delegari" has never operated, it does not now operate, to prevent a real coordination of the efforts of Congress and the Executive in making laws operable by having Congress fix standards, leaving to the Executive, as the agent of Congress, the determination and filling in of the details necessary for a workable scheme. In Field v. Clark, 143 U.S. 649, 693, 12 S.Ct. 495, 505, 36 L.Ed. 294, the matter is well stated thus:

"Legislative power was exercised when congress declared that the suspension should take effect upon a named contingency. What the president was required to do was simply in execution of the act of congress. It was not the making of law. *He was the mere agent of the law-making department to ascertain and declare the event upon which its expressed will was to take effect* (emphasis supplied). * * * So, in Locke's Appeal, 72 Pa. 491 [13 Am.Rep. 716]: 'To assert that a law is less than a law, because it is made to depend on a future event or act, is to rob the legislature of the power to act wisely for the public welfare whenever a law is passed relating to a state of affairs not yet developed, or to things future and impossible to fully know.' The proper distinction, the court said, was this: 'The legislature cannot delegate its power to make a law, but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which cannot be known to

[3] Wayman v. Southard, 10 Wheat. 1, 6 L.Ed. 253; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563; United States v. Chemical Foundation, 272 U. S. 1, at page 13, 47 S.Ct. 1, 71 L.Ed. 131; J. W. Hampton, Jr., & Co., v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; Currin v. Wallace, 306 U. S. 1, 59 S.Ct. 379, 83 L.Ed. 441; United States v. Rock Royal Co-op., 307 U. S. 533, 59 S.Ct. 993, 83 L.Ed. 1446. Cf. Yakus v. United States, 64 S.Ct. 660; Bowles v. Willingham, 64 S.Ct. 641; United States v. Randall, 2 Cir., 140 F. 2d 70.

the law-making power, and must therefore be a subject of inquiry and determination outside of the halls of legislation."

Nor need we cite authorities to support the view that Congress had, and in the War Powers Acts exercised, full and complete authority to invoke the aid of the Presidential Office and to confer authority upon it, under the conditions named in the Act, to make provision for the full and complete conservation of critical war materials, this provision to be made not by the President acting personally, but through those in the Presidential Office whom the President had clothed with the powers, and had charged with the duties, Congress had entrusted to him for such discharge. The First War Powers Act,[4] in Subd. 8, provided:

"The President may exercise any power, authority, or discretion conferred on him by this subsection (a), through such department, agency or officer of the Government as he may direct and in conformity with any rules or regulations which he may prescribe."
and the same language appears in Subd. 8 of the Second War Powers Act.[5] Acting under, and in full accordance with, these statutes, the President, on January 16, 1942, by Executive Order, No. 9024, Federal Register 7, page 329, declared:

"(1) There is established within the Office of Emergency Management of the Executive Office of the President a War Production Board, hereinafter referred to as the Board * * *. (2) The Chairman of the War Production Board, with the advice and assistance of the members of the Board shall: * * *." and "(5) The Chairman may exercise the powers, authority and discretion conferred upon him by this Order through such officials or agencies and in such manner as he may determine; and his decision shall be final."

On January 24, 1942, No. 9040, Federal Register, Vol. 7, p. 527, and again on April 7, 1942, No. 9125, Federal Register, Vol. 7, p. 2719, the President, by executive order, "defining additional functions, duties and powers of the War Production Board", declared:

"(2) The Chairman of the War Production Board may perform the functions and duties, and exercise the powers, authority, and discretion conferred upon him by this or any other order through such officials or agencies * * * and in such manner as he may determine."

Among the powers conferred upon the War Production Board and its chairman by executive order are the powers to exercise general direction of the War Procurement and Production program, and perform the functions and exercise the powers vested in the Supplies, Priorities and Allocation Board by Executive Order 8875, August 28, 1941.[6] Pursuant to these authorizations, the Chairman of the War Production Board, by orders duly published in the Federal Register, created first the Office of Director of the Division of Industrial Operations and clothed him with authority over allocations, and, later, the Office of Director General of Operations, clothing it with the same authority over the conservation of the supply of vital war materials by appropriate regulations, orders and directives. Finally, he conferred upon the Recording Secretary all the powers and authority in respect to allocation which had been vested in him as chairman of the Board, and the directives and orders in question in this case were duly issued and published in the Federal Register under such authority. On this record, we think it may not be doubted that the Congress intended to, and did, make a general delegation to the Office of the President of the authority to allocate critical war materials, and that the President, in his executive orders vesting the powers and charging the duties thus entrusted to him in others and authorizing

---

[4] 50 U.S.C.A. Appendix, § 1152.

[5] 50 U.S.C.A. Appendix, § 633.

[6] This order defining further the functions and duties of the Office for Emergency Management conferred upon the Office of Production Management control over priorities and provided that it should (d) "Continue to perform the functions and exercise all the power, authority, and discretion conferred on the President by section 2(a) of the Act entitled 'An Act to expedite national defense and for other purposes', approved June 28, 1940." It further provided in Section 2, "The Office of Production Management may exercise the powers, authorities, or discretion conferred upon it by this Order through such officials and in such manner as it may determine, subject to such policies or regulations as the Supply Priorities and Allocations Board may from time to time determine." 6 Federal Register, p. 4483.

them to make provision for carrying them out, was carrying out the congressional mandate and complying with it. We, therefore, reject point three that the President, in the executive orders he issued, exceeded, or in any manner failed to comply with, the powers and duties with which the War Powers Acts had charged him.

 It remains only to consider whether point four,[7] the point most urged by appellant, is as formidable in fact and in law as it appears to the appellant to be. We do not think it is. It is true that "It is a general rule that in all cases of delegated authority where personal trust or confidence is reposed in the agent and especially where the exercise and application of the power is made subject to his judgment or discretion, the authority 'is purely personal and cannot be delegated to another unless there is a special power of substitution either express or necessarily implied", 2 Am.Jur., Sec. 196; Shankland v. Washington, 5 Pet. 390, 8 L.Ed. 166; Am.Law Institute Restatement Agency, 78; Mechem on Agency, Book 1, Sec. 305. It is true, too, that this rule "applicable to the law of agency in the general and common law, is well understood and has had wider application in the construction of our federal and state Constitutions than it has in private law." J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 405, 48 S.Ct. 351, 72 L.Ed. 624. But it is equally well established that a delegate may, without delegating, exercise his authority through persons he appoints, Mechem, Vol. 1, Sec. 304, or he may himself delegate his authority where he has either been given express authority to do so or where the authority to delegate is implied from the nature of the agency, Mechem, Vol. 1, Secs. 316-19. An authority to delegate authority may be conferred in the same manner as authority to do other acts for the principal and may result from formal writings or informal words, Restatement Agency, Sec. 77, and when such express authority to delegate is conferred, the subagent represents the principal as though he had been directly appointed by him, 2 Am.Jur., Sec. 198; Wilson & Co. v. Smith, 3 How. 763, 11 L.Ed. 820; Mechem Agency, Sec. 332; 2 C.J.

S., Agency, § 136. "If the nature of the business, the conduct of which is committed to an agent, is such that it must be contemplated by the principal that the authority conferred on the agent will be exercised through subagents, a power in the agent to delegate that authority will be implied", 2 Am.Jur., Sec. 197, Restatement Agency, Sec. 80; 2 C.J.S., Agency, § 136, p. 1359, 1360. Cf. Fanset v. Garden City State Bank, 24 S.D. 248, 123 N. W. 686. These rules have equal force, they have been variously applied, in cases raising questions in constitutional law. Cf. Crane v. Nichols, D.C., 1 F.2d 33; Smith v. Hitchcock, 226 U.S. 53, 56, 33 S.Ct. 6, 57 L.Ed. 119; Lewis Pub. Co. v. Wymann, C.C., 152 F. 787, 799; United States v. Warfield, 4 Cir., 170 F. 43, 24 L.R.A.,N.S., 312, 17 Ann.Cas. 1186; People's U. S. Bank v. Gilson, C.C., 140 F. 1. We think it beyond question that this record presents a case under these rules not of unreasonable and unlawful, but of reasonable and lawful, delegation. By the express provisions of the War Powers Acts, the President may "exercise any power, authority, or discretion conferred upon him through such department, agency, or officer of the government, as he may direct." The executive orders provide that the Chairman of the War Production Board may perform the functions and duties and exercise the powers, authorities and discretion conferred upon him through such officials or agencies and in such manner as he may determine. These express provisions aside, we think it is too clear for debate that Congress, in conferring the powers in question, did not expect or intend that the President should in person execute all of the tremendous powers and in person discharge all the vast duties imposed upon him, and that if there had been no express authority to act by deputies, that authority would have been implied. The long and unbroken history of our government presents not a few, but a multitude of, instances where powers, the nature of which are such that they are impossible of personal execution, have been delegated to an office or a department. In all of those cases, the established practice has been that the duties so delegated are performed by the many persons the

---

[7] That the orders and directives in question were issued neither by the President nor by the Chairman of the War Production Board, but by a subordinate to whom the Chairman had attempted to delegate the powers conferred by the Acts upon the President, and by the President upon him, and they are, therefore, completely void for want of authority.

delegate has selected to perform them. The Post Office Department is a notable instance of this kind. The large delegations and subdelegations made under the Selective Service Acts are also in point; as are cases dealing with the handling of, and taxes on, imports, The Aurora, 11 U.S. 382, 7 Cranch 382, 3 L.Ed. 378; Field v. Clark, 143 U.S. 649, 12 S.Ct. 495, 36 L.Ed. 294; J. W. Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624; Buttfield v. Stranahan, 192 U.S. 470, 24 S.Ct. 349, 48 L.Ed. 525; the handling of alien property, Central Union Trust Co. v. Garvan, 254 U.S. 554, 41 S.Ct. 214, 65 L.Ed. 403; United States v. Chemical Foundation, 272 U.S. at page 13, 47 S.Ct. 1, 5, 71 L.Ed. 131; and the great body of current instances of which the books are full. In some of these cases, the statute contained an express provision for delegation. In some it did not. In the Chemical Foundation case, where the statute provided: "The President may exercise any power or authority conferred by this Act through such * * * officers as he may direct", 50 U.S.C.A.Appendix, § 5, the court said:

"Obviously all the functions of his great office cannot be exercised by the President in person. The contention that power to determine how enemy property should be sold could not be delegated to another is not sustained." Cf. Lloyd Royal Belge Societe Anonyme v. Etling, 2 Cir., 61 F. 2d 745.

▮ In the light of these authorities and of all those cited in the note,[8] it cannot be seriously contended that, when Congress enacted the War Powers Acts, it created the President as a personal agent, intended that he personally should conduct all the war production operations, including the determining of quotas and the allocation of materials, and that all of this must be done in person by the President and could not be performed by appropriate persons making up and constituting the agencies set up by the President to exercise the powers and duties conferred. Indeed, we do not understand that the appellant under this point so contends. Its contention seems to be that the vice in the matter lies in the fact that instead of the President performing the obligations himself or making rules and regulations for their performance and designating particular persons to perform them, what has occurred here is that there has been first a delegation to the President, then a delegation to the War Production Board, as his agent, and then a redelegation by the War Production Board, and that such redelegation is not permissible. We do not think that this is a correct statement of the situation. We think instead that it is correct to say there has been no delegation but merely an exercise of authority by the persons in the President's office who have been selected to perform the duties, and that the orders and directives in question here, published as they are in the Federal Register, as the official acts of the War Production Board, must be regarded as the acts of the Chairman in accordance with the principle that "An agent may as a general rule employ others to assist him in the purely ministerial or mechanical details of his duty", and the completed acts when done will be regarded as the acts of the agent though ministerial portions thereof have been performed by others. 2 Am.Jur., Sec. 199; Restatement Agency, Sec. 78; Mechem Agency, Sec. 315. In accordance with this principle it has been held that an instrument executed not by the agent but by a subordinate appointed by him to do so will bind the principal if the propriety of such execution has been determined by the agent himself, (authorities supra). Under the same principle it must be held that orders and directives signed by persons in the Agency appointed by the Chairman to sign them, though published over their signature and not the signature of the Chairman, were published not as their personal fiats but as the acts of the War Production Board, and that that board, through its chairman had in fact issued the orders and directives and caused them to be authoritatively published in the Register, Marsh v. Nichols, 128 U.S. 605, 9 S.Ct.

---

8 In 11 Am.Jur., Secs. 240–243 is to be found an excellent treatment of the authority to delegate non-legislative powers, while in the notes a great number of cases are gathered in support, and in Volume 16 of the Federal Digest, Constitutional Law, ⊂⇒62, will be found a similar comprehensive collection of cases fully supporting the view that Congress may enact a general statute setting up definite standards of action and leaving to administrative officials, departments or agencies, with their multiple employees, the administrative duty of effectuating the clearly and definitely expressed policies and standards set up in the statutes.

168, 32 L.Ed. 538; Keyser v. Hitz, 133 U.S. 138, 10 S.Ct. 290, 33 L.Ed. 531; In re Jem Yuen, D.C., 188 F. 350. But if we could agree with appellant that what has taken place here has been a redelegation or sub-delegation, we still could not agree with him that this has made the orders and directives invalid. For it seems to be settled law that, "The same principles which will admit of delegation in any case may suffice to justify a redelegation or subdelegation", Mechem, Sec. 324.

The record shows no reversible error.

The judgment is affirmed.