RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0175p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

JOSEPH A. FORTIN,

*Plaintiff-Appellant*,

*v.*

No. 23-1528

COMMISSIONER OF SOCIAL SECURITY,

*Defendant-Appellee*.

─────────────

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 2:22-cv-12593—Curtis Ivy, Jr., Magistrate Judge

Argued: May 2, 2024

Decided and Filed: August 12, 2024

Before: SILER, CLAY, and GRIFFIN, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Mahesha P. Subbaraman, SUBBARAMAN PLLC, Minneapolis, Minnesota, for Appellant. Anna M. Stapleton, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Mahesha P. Subbaraman, SUBBARAMAN PLLC, Minneapolis, Minnesota, Ryan T. Kaiser, Jason M. Turkish, NYMAN TURKISH PC, Southfield, Michigan, for Appellant. Anna M. Stapleton, Joshua M. Salzman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

─────────────

## OPINION

─────────────

GRIFFIN, Circuit Judge.

In *Lucia v. Securities and Exchange Commission*, the Supreme Court held that administrative law judges are inferior officers of the United States who must be appointed as

prescribed by the Appointments Clause. 585 U.S. 237, 251 (2018). Then-Acting Commissioner of the Social Security Administration Nancy Berryhill responded to *Lucia* by ratifying and approving as her own the prior appointments of the Administration's ALJs. One of the ALJs covered by that order denied plaintiff Joseph Fortin's claim for benefits. Fortin asserts Berryhill's actions were invalid and therefore the ALJ lacked the authority to deny his claim, but he does not otherwise take issue with the merits of the ALJ's decision. The district court rejected Fortin's arguments and granted summary judgment in favor of the Commissioner of Social Security. We affirm.

I.

The Appointments Clause requires the President to "obtain 'the Advice and Consent of the Senate' before appointing 'Officers of the United States.'" *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 292 (2017) (quoting U.S. Const. art. II, § 2, cl. 2). Ordinarily, officers are either principal or inferior. Principal officers (also known as "PAS" officers for their "Presidential appointment and Senate confirmation," *id.*) wield significant power, are nominated by the President, and are approved by the Senate. *See, e.g.*, *United States v. Arthrex, Inc.*, 594 U.S. 1, 11–13 (2021). In contrast, "inferior" officers have less power, but Congress may "vest the appointment of such officers 'in the President alone, in the Courts of Law, or in the Heads of Departments.'" *Id*. at 13 (quoting U.S. Const. art. II, § 2, cl. 2).

This case involves a third type of officer not directly contemplated by the Appointments Clause: acting officers. They are inferior officers, *Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562, 570–71 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 2608 (2023) (mem.), who temporarily hold the office of a PAS officer when a "vacancy arises and the President and Senate cannot promptly agree on a replacement," *see SW Gen.*, 580 U.S. at 292. "Congress has long accounted for this reality by authorizing the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation." *Id*. at 293. Indeed, Congress has authorized the use of acting officers since the founding era, repeatedly recognizing that permitting acting officers to fulfill a vacant office's duties for a limited time ensures efficient governance while the President and the Senate work to nominate and confirm a permanent officer. *See, e.g.*, *id.* at 293–95; *Rop*, 50 F.4th at 571–73. "The [Federal Vacancies

Reform Act of 1998, 5 U.S.C. § 3345 *et seq*.,] is the latest version of that authorization." *SW Gen.*, 580 U.S. at 293.

The Vacancies Reform Act establishes a scheme to automatically fill vacant PAS offices with acting officers. Section 3345(a)(1) establishes a general rule that, when a PAS officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office . . . the first assistant to the office of such officer shall perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). Alternatively, "the President (and only the President)" can "direct" qualified individuals "to perform the functions and duties of the vacant office temporarily in an acting capacity." *Id*. § 3345(a)(2)–(3). Generally, these acting officers can stay in their temporary roles for 210 days or while a nomination is pending. *Id*. § 3346(a). Finally, "[t]he [Vacancies Reform Act] ensures compliance by providing that, in general, 'any function or duty of a vacant office' performed by a person not properly serving under the statute 'shall have no force or effect.'" *SW Gen.*, 580 U.S. at 296 (quoting 5 U.S.C. § 3348(d)).

With that background set, we turn to this case. At the end of President Obama's second term, he entered a succession order for the Social Security Administration. *See* Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg. 96337 (Dec. 23, 2016). The order established that, consistent with the Vacancies Reform Act, if both the Commissioner and Deputy Commissioner positions were vacant, a series of SSA officials "shall act as and perform the functions and duties of the" Commissioner, beginning with the Deputy Commissioner for Operations (DCO). *See id*.; 5 U.S.C. §§ 3345(a), 3346(a)(1). Acting Commissioner Carolyn Colvin triggered the succession order by resigning on President Trump's inauguration day, so DCO Nancy Berryhill became the new Acting Commissioner.

Berryhill served in that role until the Government Accountability Office notified President Trump that her limited tenure as Acting Commissioner under the Vacancies Reform Act had expired. She immediately stepped down but later returned to the position (also under President Obama's succession order) when President Trump nominated Andrew Saul to be the SSA's Commissioner. *See* 5 U.S.C. §§ 3345(a), 3346(a)(2); 81 Fed. Reg. 96337.

During Berryhill's second stint as Acting Commissioner, the Supreme Court decided *Lucia*, holding that ALJs are inferior officers who must be appointed as prescribed by the Appointments Clause. *See* 585 U.S. at 251. In response a few weeks later, Berryhill "ratif[ied] the prior appointment of" the SSA's ALJs and "approve[d] these appointments as [her] own." Saul was confirmed and sworn in eleven months later, ending Berryhill's tenure as Acting Commissioner.

Meanwhile, plaintiff Fortin applied for disability insurance benefits years before Berryhill became Acting Commissioner and the Supreme Court decided *Lucia*. An ALJ denied his claim. But by the time he appealed that denial to us, the Supreme Court had decided *Lucia*, so Fortin argued that he was entitled to a new hearing in front of a properly appointed ALJ. We remanded Fortin's case (and others) for a new hearing before a new ALJ covered by Berryhill's post-*Lucia* order. *Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537, 547 (6th Cir. 2020).

On remand, ALJ Virginia Herring, covered by Acting Commissioner Berryhill's post-*Lucia* order, denied Fortin's application for benefits. Fortin sought judicial review of that decision in federal district court. Although he argued that ALJ Herring erred by denying his application for benefits, he focused on ALJ Herring's appointment, arguing that he was entitled to remand before a new ALJ because Acting Commissioner Berryhill lacked the authority to issue her post-*Lucia* order. The district court disagreed, holding that Acting Commissioner Berryhill's post-*Lucia* order properly ratified ALJ Herring's appointment and that ALJ Herring did not err on the merits by denying Fortin's application for benefits.

II.

On appeal, Fortin does not challenge ALJ Herring's decision on the merits. Instead, he raises a series of constitutional and statutory arguments that ALJ Herring was invalidly appointed by an improper Acting Commissioner. We group these into three categories: that Berryhill was never permitted to become Acting Commissioner; that she could not return to the Acting Commissioner role after her first term ended; and that Berryhill lacked the authority, as Acting Commissioner, to enter her post-*Lucia* order. We reject each argument.

We review de novo the legal issues presented on appeal.  *See generally Estate of Riddle ex rel. Riddle v. S. Farm Bureau Life Ins. Co.*, 421 F.3d 400, 404 (6th Cir. 2005) ("It is well-settled that we review questions of law *de novo*.").  *Cf. Wilmington Tr. Co. v. AEP Generating Co.*, 859 F.3d 365, 370 (6th Cir. 2017) (summary judgment); *Roberts v. Hamer*, 655 F.3d 578, 582 (6th Cir. 2011) (statutory interpretation).  Many of Fortin's arguments require us to interpret statutes—primarily the Vacancies Reform Act.  When doing so, "we begin with the understanding that Congress says in a statute what it means and means in a statute what it says there."  *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000) (internal quotation marks omitted).  And "when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms."  *Id.* (internal quotation marks omitted).  So when, as here, "the natural reading of the text" is clear, our inquiry goes no further and "we do not sit to assess the relative merits of different approaches" Congress could have taken.  *Id.* at 13.

III.

We first consider whether the Vacancies Reform Act or the Appointments Clause prevented Berryhill from becoming Acting Commissioner during the Trump administration pursuant to President Obama's succession order.  They did not.

A.

Fortin argues that the Vacancies Reform Act's requirement that "the President (and only the President) may direct" a qualified individual to serve as an acting officer means the sitting president.  According to Fortin, "the President" never "direct[ed]" Berryhill to become Acting Commissioner because President Obama issued the succession order and Berryhill did not become Acting Commissioner until the Trump administration.

The Third and Eighth Circuits have already succinctly rejected this argument, holding that President Obama's appointment order carried over into the Trump administration.  As explained by the Eighth Circuit:

> [5 U.S.C. §] 3345 says "the President (and only the President) may direct" an agency employee to serve in an acting capacity.  [The plaintiff] argues the word

"direct" means only President Trump could direct someone to serve as Acting Commissioner during the relevant time period. To "direct" requires affirmative action, but President Obama's 2016 succession memo qualified as such. The issue then becomes whether a presidential order is carried forward to the next president. The general rule is that presidential orders without specific time limitations carry over from administration to administration. While an incoming president can undo a previous presidential order, a new president does not have to take affirmative action to keep existing orders in place. [The plaintiff] provides no authority indicating succession orders are any different from other presidential orders. The text of the [Federal Vacancies Reform Act] likewise does not change the default position that presidential orders, including succession memos under the [Federal Vacancies Reform Act], carry over from one administration to the next.

The [Federal Vacancies Reform Act] authorizes succession memos such as the one President Obama issued in December 2016. One way to designate an individual to serve as Acting Commissioner is for the President to direct an employee of an agency to serve as acting director. This is exactly what the 2016 succession memo did. The succession memo directed the Deputy Commissioner for Operations to perform the functions of the Commissioner if the Commissioner and Deputy Commissioner positions were vacated. This is a common practice used by presidents to ensure a smooth transition of power.

*Dahle v. Kijakazi*, 62 F.4th 424, 429 (8th Cir. 2023) (internal citations omitted); *see also Gaiambrone v. Comm'r of Soc. Sec.*, No. 23-2988, 2024 WL 3518305, at *3 (3d Cir. July 24, 2024). *Cf.* Legal Effectiveness of a Presidential Directive, as Compared to an Exec. Order, 24 Op. O.L.C. 29, 29 (2000) (explaining that executive actions "remain effective" across administrations "until subsequent presidential action is taken"); *United States v. Wyder*, 674 F.2d 224, 227 (4th Cir. 1982) ("The acts of administrative officials continue in effect after the end of their tenures until revoked or altered by their successors in office. Any other general rule would impose an undue burden on the administrative process.").

We agree with the Third and Eighth Circuits. Fortin's argument suffers from the same primary deficiency as the plaintiff in *Dahle*: he "provides no authority indicating succession orders are any different from other presidential orders" that remain effective across administrations. 62 F.4th at 429. Nor are we aware of any such authority. Instead, Fortin focuses on a hyper-technical interpretation of the statute's text. According to him, "the President (and only the President)" refers to the sitting President when the succession order is triggered, not the office in general or the President when it was enacted. If that was Congress's intention, it

could have said "the President (and only the *sitting* President)." Congress chose not to do so. Without clear instructions from Congress to the contrary, we must interpret the Vacancies Reform Act consistently with the general rule that executive actions survive changes in administration. Viewing the Vacancies Reform Act this way simply means that the President, rather than any other official, must be the one to designate acting officers under 5 U.S.C. § 3345(a)(2)–(3). And that is exactly what happened here: President Obama issued the valid succession order that directed Berryhill to become Acting Commissioner.

This succession order did not necessarily prospectively tie President Trump's hands because it could have been triggered while President Obama remained in office. *Cf.* Auth. of the President to Prospectively Appoint a Sup. Ct. Just., 46 Op. O.L.C. ---, 2022 WL 1166542, at \*1 (Apr. 6, 2022); *see also Murphy v. Pearson*, 667 S.E.2d 83, 85 (Ga. 2008); *State ex rel. Norman v. Viebranz*, 483 N.E.2d 1176, 1178 (Ohio 1985); *Mullinax v. Garrison*, 373 S.E.2d 471, 472–73 (S.C. 1988) (per curiam). The nature of this succession order differs from Fortin's hypotheticals in which an outgoing President makes prospective appointments that come into effect only after he has left office. Consequently, the President enacted a succession order, that could have been triggered at any time, which twice directed Berryhill to become Acting Commissioner. Following the general rule for executive actions, that succession order did not expire upon President Trump's inauguration. And President Trump did not need to enter a new succession order for Berryhill to become the Acting Commissioner.

Moreover, Fortin's argument that succession orders must be issued by the sitting President contains staggering implications. If he is correct, then dozens of succession orders would need to be reissued. *See, e.g.*, Exec. Order No. 12879, 58 Fed. Reg. 59929 (Nov. 8, 1993). In addition, certain actions taken by acting officers serving under prior succession orders would be null and void. *See* 5 U.S.C. § 3348(d). We demand more clarity from Congress to reach such a sweeping conclusion based on the understanding that "Congress . . . does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). Thus, we agree with the Third and Eighth Circuits that the Vacancies Reform Act does not require the sitting President to issue a succession order as long as a previous President did so.

B.

Fortin next contends that Berryhill never properly served as Acting Commissioner because only the sitting President can "appoint" an acting officer under the Appointments Clause.

This argument stumbles out of the gate because "[a]cting officials . . . are not appointed." *Rop*, 50 F.4th at 573 (internal quotation marks omitted). Indeed, the Supreme Court has long permitted an officer's powers and duties to expand without the need for a separate appointment. *Cf. Weiss v. United States*, 510 U.S. 163, 170–74 (1994); *see Shoemaker v. United States*, 147 U.S. 282, 301 (1893) ("It cannot be doubted, and it has frequently been the case, that congress may increase the power and duties of an existing office without thereby rendering it necessary that the incumbent should be again nominated and appointed."). And the Vacancies Reform Act states that the President "may direct" a qualified individual to serve as an acting officer—it does not say he makes any appointment.

That linguistic distinction was deliberate. *See Edmond v. United States*, 520 U.S. 651, 657–58 (1997) ("The difference between the power to 'assign' officers to a particular task and the power to 'appoint' those officers is not merely stylistic."); *Weiss*, 510 U.S. at 171–72 (discussing the distinction between when Congress requires a new "appointment" for military officers compared to when officers do not need a new appointment to be "detailed" to a new position). Take the Social Security Administration as an example. The Social Security Act, 42 U.S.C. § 301 *et seq.*, specifies that the Commissioner and the Deputy Commissioner both "shall be appointed by the President, by and with the advice and consent of the Senate." 42 U.S.C. § 902(a)(1), (b)(1). But it does not state that a separate appointment is required for the Acting Commissioner. *See id*. § 902(b)(4) ("The Deputy Commissioner shall be Acting Commissioner of the Administration during the absence or disability of the Commissioner and, unless the President *designates* another officer of the Government as Acting Commissioner, in the event of a vacancy in the office of the Commissioner." (emphasis added)). Similar schemes can be found throughout the United States Code. *See, e.g.*, 28 U.S.C. § 503 ("The President shall appoint, by and with the advice and consent of the Senate, an Attorney General of the United States."); *id*. § 504 ("The President may appoint, by and with the advice and consent of the Senate, a Deputy

Attorney General."); *id.* § 508(a) ("In case of a vacancy in the office of Attorney General, or of his absence or disability, the Deputy Attorney General may exercise all the duties of that office, and for the purpose of section 3345 of title 5 the Deputy Attorney General is the first assistant to the Attorney General.").

Contrast the language of those appointment statutes with the Vacancies Reform Act, which provides that the President "may direct" qualified individuals "to perform the functions and duties of the vacant office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(2)–(3). The deliberate choice in the Vacancies Reform Act to say that the President "directs" a qualified individual to become an acting officer instead of "appointing" the acting officer was purposeful. So Berryhill was not "appointed" to the Acting Commissioner role, and the Appointments Clause was not implicated by her assumption of the role. Instead, her powers and responsibilities simply expanded to include those of the Acting Commissioner.

In summary, President Obama's succession order remained effective during the Trump administration and directed Berryhill to assume the Acting Commissioner role after Colvin's resignation and again after Saul's nomination.

IV.

Fortin next focuses on Berryhill's return to the Acting Commissioner role, contending that she could not become Acting Commissioner again upon Saul's nomination. His arguments come in two forms: the Vacancies Reform Act allows only one term of service for an acting officer; and Berryhill vacated her DCO position when she became Acting Commissioner and therefore was no longer next in line of succession when Saul was nominated. Again, we disagree.

A.

Fortin asserts that Berryhill could not return to the Acting Commissioner role upon Saul's nomination because the Vacancies Reform Act allows only one term of acting service under 5 U.S.C. § 3346(a). The Third, Fourth, Fifth, and Eighth Circuits have all addressed this question and concluded that Berryhill complied with the Vacancies Reform Act when she

became Acting Commissioner for the second time upon Saul's nomination. *Rush v. Kijakazi*, 65 F.4th 114, 117 (4th Cir. 2023); *Seago v. O'Malley*, 91 F.4th 386, 390 (5th Cir. 2024); *Dahle*, 62 F.4th at 427; *Gaiambrone*, 2024 WL 3518305, at *3. We agree with our sister circuits.

The Vacancies Reform Act's time limitations for acting officers are outlined in § 3346:

(a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—

> (1) for no longer than 210 days beginning on the date the vacancy occurs; or

> (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)

> (1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

> (2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—

>> (A) until the second nomination is confirmed; or

>> (B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

(c) If a vacancy occurs during an adjournment of the Congress sine die, the 210-day period under subsection (a) shall begin on the date that the Senate first reconvenes.

Subsection (a) begins by stating to whom it applies: individuals serving as acting officers under § 3345. That specification matters because an acting officer can serve in that position based on other statutes. *See, e.g.*, 42 U.S.C. § 902(b)(4). After establishing to whom it applies, subsection (a) provides that these individuals can remain in their acting roles for a limited time. Generally, subsection (a)(1) limits service to a specific number of days (210), beginning "on the date the vacancy occurs." Alternatively, subsection (a)(2) allows acting service while a nomination for the vacant office is pending before the Senate. Unsurprisingly, given that

subsection (a)(2) permits acting service during a pending nomination, its term begins when the nomination is submitted to the Senate and is not limited by a specific number of days. Nothing in subsection (a) suggests that subsection (a)(2)'s nomination provision can be triggered only if the nomination occurs within subsection (a)(1)'s 210-day period while the acting officer is already serving as such under subsection (a)(1). Indeed, the plain language suggests just the opposite.

Fortin nevertheless argues that subsection (a)(2) cannot trigger a second term of acting service because subsections (a)(1) and (2) are joined by the word "or," which prevents acting service from being triggered by each subsection independently. But the word "or" can be used in the inclusive sense (A or B, or both) and the exclusive sense (A or B, but not both). And "[t]he meaning of *or* is usually inclusive." Bryan A. Garner, Garner's Dictionary of Legal Usage 639 (3d ed. 2011) (citation omitted); *accord Rush*, 65 F.4th at 120; Bryan A. Garner, Garner's Modern American Usage 45–46 (3d ed. 2009) ("If you are offered coffee or tea, you may pick either (or, in this case, neither), or you may for whatever reason order both. This is the ordinary sense of the word, understood by everyone and universally accommodated by the simple *or*."). Interpreting subsections (a)(1) and (2) to establish two independent time periods of "acting" service therefore is consistent with the usual meaning of "or."

The rest of § 3346 confirms the conclusion that subsections (a)(1) and (2) establish independent triggering events. Subsection (b) outlines when an acting official may stay in that position after a first or second nomination is rejected. Its use of the phrase "may continue to serve" shows that it is subordinate to subsection (a), which initiates acting service. The lack of a similar phrase in subsection (a)(2) belies Fortin's favored interpretation that subsection (a)(2) is triggered only if the nomination occurs within subsection (a)(1)'s time limit.

Neither does subsection (c) alter this result. This subsection explains that if a vacancy occurs while Congress is adjourned, then the normal 210-day clock under subsection (a)(1) does not begin to run until after the Senate reconvenes. The lack of a reference to service pursuant to a nomination (meaning subsection (a)(2)) is logical because that time limit is measured by the life of the nomination, not a specific number of days. Indeed, because the term of service established in subsection (a)(2) is not a specific number of days, there would be no reason to

refer to it in subsection (c). Moreover, subsection (c) is designed to extend a term of acting service that begins while Congress is adjourned, so the 210-day clock does not begin to run until Congress reconvenes. That is exactly what would happen with service triggered by a nomination because that nomination would remain pending during Congress's adjournment—effectively extending the period of acting service in the same way. Subsection (c) simply provides a similar extension to subsection (a)(1)'s 210-day period of acting service.

Finally, the Supreme Court's passing statement in *SW General* that subsection (a)(2) tolls the 210-day limit from subsection (a)(1) does not prevent subsection (a)(2) from also triggering a separate term of service. 580 U.S. at 296. That statement, which is merely dictum, *Dahle*, 62 F.4th at 428, came in the midst of an overview of the Vacancies Reform Act, but it did not include detailed analysis of subsection (a), *see id*. at 295–96. Admittedly, we give Supreme Court dicta great weight. *Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019). But that deference is not controlling here, as the Supreme Court's conclusion that subsection (a)(2) tolls the time limit from subsection (a)(1) does not preclude subsection (a)(2) from also acting as an independent triggering provision for active service. Consequently, like our sister circuits, we conclude that the *SW General* Court's statement regarding subsection (a)(2) sometimes tolling the 210-day time limit in (a)(1), 580 U.S. at 296, does not foreclose the existence of "two independent periods of acting service" under these two subsections. *Rush*, 65 F.4th at 122; *accord Seago*, 91 F.4th at 392; *Dahle*, 62 F.4th at 428.

Section 3346's plain text makes clear that subsections (a)(1) and (2) are independent triggering events for acting service. Berryhill therefore did not violate § 3346 when she returned to the Acting Commissioner role upon Saul's nomination.

B.

Next, Fortin argues that Berryhill vacated her DCO position when she became Acting Commissioner, so she was outside the line of succession when Saul's nomination triggered President Obama's SSA succession order a second time.

1.

When Berryhill first became Acting Commissioner, Mary Horne temporarily filled in as Acting DCO, meaning Horne assumed Berryhill's DCO duties (though not the permanent title) during Berryhill's time as Acting Commissioner. According to Fortin, that backfilling forced Berryhill to vacate the permanent DCO position by operation of law. We disagree.

In acting-officer situations, "the general expectation [is] that an acting officer will continue to occupy his own office and perform its duties even while he is temporarily acting in another office." Designating an Acting Dir. of Nat'l Intel., 43 Op. O.L.C. ---, 2019 WL 6655655, at *9 (Nov. 15, 2019). However, that scenario did not happen here because Horne backfilled Berryhill as Acting DCO. *See id.* at *9–11. But even if Horne should not have taken the Acting DCO role, her doing so did not force Berryhill to vacate the permanent position.

Our conclusion is supported by a recent opinion from the Office of Legal Counsel. In *Designating an Acting Director of National Intelligence*, the Office of Legal Counsel addressed whether the President could designate Joseph Maguire, the Director of the National Counterterrorism Center (NCTC Director), as the Acting Director of National Intelligence (Acting DNI). *Id.* at *1. A statutory provision prevents the NCTC Director from "simultaneously serv[ing] . . . in any other capacity in the executive branch," *id.*, so the Office of Legal Counsel explained that if Maguire became the Acting DNI, he would need to be backfilled by an Acting NCTC Director, *id.* at *9–10 (quoting 50 U.S.C. § 3056(b)(2)). Even so, Maguire still encumbered the NCTC Director position, and the Office of Legal Counsel concluded he would return to his permanent position as NCTC Director when he stopped being Acting DNI. *Id.*

The facts here present less of a problem than those there. No statute prevented Berryhill from holding the DCO and Acting Commissioner positions at the same time. So Berryhill encumbered the DCO position while she was Acting Commissioner despite Horne backfilling her as Acting DCO. Moreover, even if Horne improperly held the Acting DCO position (because Berryhill should have simultaneously performed the duties of the DCO and Acting Commissioner), Fortin has neither cited any authority showing that an improperly designated

acting officer displaces the permanent officer from the position nor challenged any of Acting DCO Horne's actions.

In sum, we hold that an acting officer encumbers her permanent position even if that permanent position is backfilled—whether properly or improperly—by another acting officer. Thus, Berryhill did not vacate her DCO position when Horne backfilled her as Acting DCO.

2.

Fortin next argues that the incompatible-officer doctrine required Berryhill by operation of law to vacate her DCO position when she became Acting Commissioner. This doctrine is rooted in the common-law idea that "it is the duty of a public officer to discharge his or her duties uninfluenced by the duties and obligations of another office." 63C Am. Jur. 2d *Public Officers and Employees* § 57 (2024).

> Incompatibility in offices is found whenever one office is subordinate to the other in some of its important and principal duties, and subject in some degree to the other's revisory power. Incompatibility exists where one office is subject to the audit or review of the other. Equally, two offices are incompatible where the incumbent of the one has the power of appointment to the other office or the power to remove its incumbent.

*Id.* § 59 (footnotes omitted); *see also Zunski v. Frenchtown Rural Fire Dep't Bd. of Trs.*, 309 P.3d 21, 25 (Mont. 2013) ("The doctrine provides that a person cannot hold an office over which the person exercises supervisory control."). On its face, this doctrine seems to apply to Berryhill's simultaneous holding of the DCO and Acting Commissioner roles, given that the Commissioner supervises the DCO. *See Organizational Structure of the Social Security Administration*, Soc. Sec., https://www.ssa.gov/org/index.htm (last visited Aug. 9, 2024)); *Organizational Structure of the Social Security Administration*, Soc. Sec., https://www.ssa.gov/org/orgDCO.htm (last visited Aug. 9, 2024) (explaining that the DCO "is directly responsible to the Commissioner for carrying out the ODCO [Office of the Deputy Commissioner, Operations] mission and providing general supervision to the major components of ODCO"). That supervisor-supervisee relationship implicates the incompatible-officer doctrine.

Yet mere implication is not enough. Fortin must show that the doctrine required Berryhill to vacate her DCO position by operation of law when she became Acting Commissioner. He cannot for two reasons.

First, the Vacancies Reform Act directly conflicts with the incompatible-officer doctrine. The Vacancies Reform Act expressly contemplates supervisees of a vacant office filling it in an acting capacity and never suggests that doing so requires the acting officer to vacate her permanent office. *See* 5 U.S.C. § 3345(a)(1), (3). And because statutory text supersedes the common law, the incompatible-officer doctrine cannot require an acting officer under the Vacancies Reform Act to vacate her permanent position. *Cf. City of Milwaukee v. Ill. & Mich.*, 451 U.S. 304, 314 (1981) ("Federal common law is a necessary expedient, and when Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears." (internal quotation marks omitted)); *Gray v. Nelson*, 533 F.2d 334, 336 (6th Cir. 1976) (applying Michigan law and holding that "[w]here there is a conflict between a statute and common law, the statute must prevail, for the common law may be changed or modified by statute" (internal quotation marks omitted)).

Second, Fortin has pointed to no authority showing that this doctrine has ever been invoked in an acting-officer situation, which differs from a situation in which the same person permanently holds incompatible offices. Nor are we aware of any. In addition to the statutory conflict noted above, this dearth of such authority is likely because the incompatible-officer doctrine seeks to prevent corruption by one individual holding multiple offices and powers. Acting officers, however, do not raise those concerns due to their temporary nature. As such, the incompatible-officer doctrine does not prevent an official from encumbering her permanent position while also taking on the responsibilities—in an acting capacity—of a vacant office that would ordinarily supervise her. *See, e.g.*, 63C Am. Jur. 2d *Public Officers and Employees* § 61 (2024) ("Under some provisions prohibiting dual officeholding, it is not until an office holder actually takes the required oath for the second office that the vacation of the first office occurs."). That is especially true in a situation like this one in which the encumbered position was backfilled.

Thus, the incompatible-officer doctrine did not require Berryhill to vacate her DCO position when she became Acting Commissioner.

3.

Finally, Fortin argues that federal personnel law required Berryhill to vacate her DCO position when she became Acting Commissioner. This argument relies on 5 U.S.C. § 3593(b), which provides that:

> A career appointee who is appointed by the President to any civil service position outside the Senior Executive Service and who leaves the position for reasons other than misconduct, neglect of duty, or malfeasance shall be entitled to be placed in the Senior Executive Service if the appointee applies to the Office of Personnel Management within 90 days after separation from the Presidential appointment.

Even if the DCO is a "career appointee" covered by this section and the Acting Commissioner is a "civil service position outside the Senior Executive Service," this provision plainly does not apply because, as explained in Part III.B., Berryhill was never "appointed" to the Acting Commissioner role. So § 3593(b) did not require Berryhill to reapply for the DCO position. Instead, Berryhill encumbered the DCO position while she was Acting Commissioner. At all relevant times Berryhill was the DCO; temporarily expanding her powers and duties as Acting Commissioner did not change her retention of the DCO position.

V.

Fortin's final arguments challenge Berryhill's authority as Acting Commissioner to enter her post-*Lucia* order. Like Fortin's other arguments, these too fail—acting officers possess the permanent position's full powers, and the Vacancies Reform Act's ratification bar does not apply here.

A.

Begin with considering what constitutional powers Berryhill had as Acting Commissioner. Fortin argues that Berryhill's post-*Lucia* order was an "unreviewable executive action" that only a principal officer could make. At first glance, this argument appears meritorious because acting officers are inferior officers. And the Supreme Court explained in

*Arthrex* that only principal officers can take unreviewable actions that bind the Executive Branch. 594 U.S. at 18; *see also Lucia*, 585 U.S. at 244–45.

But we need not decide whether Berryhill's post-*Lucia* order was an unreviewable executive action because "the [Supreme] Court has clearly addressed inferior officers taking on the responsibilities of principal officers when vacancies arise as a constitutionally permitted practice." *Rop*, 50 F.4th at 570; *accord SW Gen.*, 580 U.S. at 293 ("Congress has long accounted for th[e] reality [of vacant PAS offices] by authorizing the President to direct certain officials to temporarily carry out the duties of a vacant PAS office in an acting capacity, without Senate confirmation."); *United States v. Eaton*, 169 U.S. 331, 343 (1898) ("Because the subordinate officer is charged with the performance of the duty of the superior for a limited time, and under special and temporary conditions, he is not thereby transformed into the superior and permanent official."); *Ryan v. United States*, 136 U.S. 68, 81 (1890) ("It is equally clear that, in the [absence] of the secretary [of war], the authority with which he was invested could be exercised by the officer who, under the law, became for the time acting secretary of war."); *Keyser v. Hitz*, 133 U.S. 138, 145–46 (1890) ("There is an officer designated a 'deputy comptroller of the currency,' who may exercise the powers and discharge the duties attached to the office of comptroller during a vacancy in that office, or during the absence or inability of the comptroller."); Acting Officers, 6 Op. O.L.C. 119, 120 (1982) ("An acting officer is vested with the full authority of the officer for whom he acts."). So even though Berryhill was merely an inferior officer as Acting Commissioner, she nevertheless temporarily had all the power of the vacant Commissioner position. *See Rop*, 50 F.4th at 570–71.

Fortin does not argue that the Appointments Clause would have prevented a permanent Commissioner from issuing Berryhill's post-*Lucia* order. Nor could he because the Commissioner has the authority to appoint ALJs and to ratify their decisions. And because an Acting Commissioner possesses all the powers of the permanent Commissioner, Acting Commissioner Berryhill had the constitutional authority to issue her post-*Lucia* order. *See Gaiambrone*, 2024 WL 3518305, at *2 ("In sum, we conclude that the Appointments Clause did not require that Berryhill's ratification of the SSA ALJs be subject to review by a PAS officer.").

B.

Fortin's final argument is that the Vacancies Reform Act prevented Berryhill from ratifying ALJ Herring's appointment because an officer cannot ratify past acts that violated the Vacancies Reform Act.

This argument relies on 5 U.S.C. § 3348(d), which provides that certain actions that would violate the Vacancies Reform Act "may not be ratified." Fortin contends that ALJ Herring's initial appointment, made by an employee within the SSA, violated the Vacancies Reform Act, preventing Berryhill from ratifying that appointment under § 3348(d)'s ratification bar.

Section 3348(d)'s ratification bar does not apply here because Acting Commissioner Berryhill's post-*Lucia* order not only ratified the appointment of all the SSA's ALJs, but it also appointed them anew: "I hereby ratify the prior appointment of the individuals listed below to the office of administrative law judge in the Social Security Administration, and I today approve these appointments as my own under the Constitution." The two clauses in this sentence are equally important. First, by ratifying prior appointments, Acting Commissioner Berryhill retroactively authorized those appointments and actions taken by those ALJs. Doing so prevented claimants from reaching back and challenging those ALJs' decisions that preceded Berryhill's order. Second, Berryhill approved these appointments "as [her] own." That acted prospectively and ensured each SSA ALJ had a valid appointment from Berryhill's order onward even if the initial appointment could not be ratified.

Fortin argues that § 3348(d)(2)'s "ratification" bar applies both retroactively and prospectively, thereby preventing Acting Commissioner Berryhill from appointing ALJ Herring at all. But "ratification" has retrospective effect only. *See, e.g.*, *Ratify*, Merriam-Webster's Collegiate Dictionary (10th ed. 1998) (defining "ratify" as "to approve and sanction formally"); *see also Ratification*, Black's Law Dictionary (7th ed. 1999) (defining "ratification" as "Confirmation and acceptance of a previous act, thereby making the act valid from the moment it was done"); *cf. Approve*, Merriam-Webster's Collegiate Dictionary (10th ed. 1998) (defining "approve" as "to give formal or official sanction to").

What is more, accepting Fortin's favored construction of Berryhill's order would not make sense within the context of § 3348(d). That section limits the power of acting officers by making actions taken outside the scope of proper acting service void ab initio and unratifiable. But preventing the ratification of a past act, such as appointing an ALJ, and preventing prospective actions, like appointing that ALJ in the first instance, are fundamentally different. Section 3348(d) prohibits reaching back and ratifying past actions; it would strain the statutory text to the breaking point to also conclude that it prevents reissuing an order with prospective effect. If so, then an act declared void by § 3348(d)(1) could never be taken again, even on a prospective basis. That cannot be the case. Thus, ALJ Herring was validly appointed by Acting Commissioner Berryhill when she denied Fortin's claim for benefits. And because ALJ Herring was not assigned Fortin's case until after this appointment, we need not consider whether § 3348(d)'s ratification bar prevented Berryhill from ratifying ALJ Herring's prior appointment. Fortin is not entitled to relief under § 3348(d).

## VI.

For these reasons, we affirm the district court's grant of summary judgment in favor of the Commissioner.